## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No.:

EUGENE OAKES, individually
and on behalf of a class of similarly
situated persons,

     Plaintiff,

v.                                                                    JURY TRIAL DEMANDED

BLUE CROSS AND BLUE SHIELD
OF FLORIDA, INC., d/b/a/ FLORIDA
BLUE,

     Defendant.

_____/

## CLASS ACTION COMPLAINT

Plaintiff Eugene Oakes, individually and on behalf of a class of similarly situated

persons, files this Class Action Complaint against Defendant Blue Cross and Blue Shield

of Florida, Inc. ("Florida Blue" or "Defendant").

## INTRODUCTION

This case arises from Defendant's uniformly unlawful conduct, which has

uniformly injured thousands of people in exactly the same way. Defendant's unlawful

conduct is embodied in, and carried out through, a fraudulent scheme to deny paid-for

health insurance coverage of a miracle cure for a hitherto incurable, potentially fatal

disease. The disease is hepatitis C, and the cure is Harvoni, which cures at least 95% of

cases in as little as six to eight weeks, and is "medically necessary" as a matter of law.

Plaintiff Eugene Oakes and other persons similarly situated (the "ERISA Class

Members" or "Class Members") seek damages and injunctive relief for Defendant's

violations of the Employee Retirement and Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1169.

## NATURE OF THE ACTION

1.      Every medical professional on Earth, and all who work with them, learn that the first rule of medicine is to "do no harm." This case arises not merely from Defendant's callous indifference to doing harm, but from its ***deliberate choice to do harm***, in order to maximize profits by avoiding costs. Defendant has chosen to inflict irreparable harm on its insureds instead of preventing it.

2.      Defendant Florida Blue  markets and sells its health insurance products (the "Policies") to many thousands of Policy holders in Florida and across the nation who suffer from hepatitis C (the "Insureds"), who have the right to rely on Defendant to handle their health insurance claims with the utmost good faith.

3.      Defendant, acting in concert with others, is engaged in an unlawful pattern and practice of using pretextual and inherently fraudulent "cost-avoidance" criteria to deny coverage for a miracle cure of a hitherto incurable disease to Plaintiff and other similarly situated Insureds who have hepatitis C but have not yet suffered irreversible, life-threatening liver damage from it. Defendant's conduct has not only caused harm, and threatens to cause irreparable harm, to Plaintiff, but also to thousands of similarly situated Insureds.

4.      Hepatitis C causes serious health complications, including severe liver damage, infections, liver cancer, and death. Hepatitis C is the leading cause of cirrhosis—a disease in which healthy liver tissue is replaced with scar tissue, which prevents the liver from functioning properly and can lead to liver failure and liver cancer. Even before

2

suffering irreversible liver damage, persons with hepatitis C can suffer serious health issues, including a high risk of heart attack, fatigue, depression, joint pain, itchy skin, fever, sore muscles, arthritis, and jaundice.

5.      Until recently, there was no effective treatment, let alone cure, for hepatitis C. In October 2014, the U.S. Food and Drug Administration ("FDA") approved Harvoni, calling it a "breakthrough drug," because it can cure hepatitis C in a remarkable 95% to 99% of cases. Harvoni is taken once daily in pill form. It can eradicate hepatitis C and cure the patient in as little as six to eight weeks with few side effects. Since October 2014, Harvoni has been the medical community's standard of care for treating hepatitis C. The manufacturer has priced Harvoni at approximately $99,000 for a 12-week treatment in the United States, but insurers, including Florida Blue, have obtained it at steep discounts.

6.      In disclosures to Plaintiff and Class Members that are uniform in all material respects, Defendant consistently, expressly, and uniformly misrepresented that coverage and treatment decisions under the Policies are made on the basis of "medical necessity." As a matter of law and logic, a miracle cure for a hitherto incurable, potentially fatal disease is medically necessary. But contrary to Defendant's express representations, and in furtherance of a common, unlawful scheme, Defendant, acting in concert with others, is and has been systematically and continuously breaching its promises, by intentionally misrepresenting and failing to disclose that it will not provide medically necessary coverage unless it serves to promote their pretextual and unlawful cost-avoidance scheme, whose goal is to deny coverage for the Harvoni miracle cure to 80% of Defendant's insureds who suffer from hepatitis C. The "guidelines" purport to do

3

that by limiting coverage for Harvoni treatment to Insureds who can demonstrate that they already have suffered irreparable liver damage, in the form of severe fibrosis or cirrhosis, by submitting to an inherently dangerous liver biopsy and demonstrating a so-called "Metavir score" of F3 or F4.[1]

7.      To carry out and conceal its unlawful scheme, Defendant attempted to put it into a plausible medical disguise, by misuse of pretextual coverage "guidelines" that would require Insureds to suffer irreparable harm before coverage will be provided. These "guidelines" are inherently fraudulent and an attempt to cover up Defendant's true motive, which is to avoid paying Harvoni claims for 80% of its Insureds. Seldom is fraud as obvious (and egregious) as it is here, where Defendant attempted to justify its "guidelines" by misrepresenting a report from the American Association for the Study of Liver Diseases (the "AASLD"—whose initial report will be referred to herein as the "AASLD Report"). When the AASLD learned that Defendant and other health insurers were using its report as a basis to force insureds to suffer irreparable harm, it publicly condemned such use, "adamantly disagreed" with the insurers' current practice of

---

[1] A Metavir score measures liver scarring, which is irreversible, i.e., irreparable. An F0 or F1 score generally denotes an unscarred liver, while an F2 score denotes significant scarring (fibrosis). This test cannot reliably distinguish between F2 and F3 (severe fibrosis), while an F4 score indicates cirrhosis, which itself can be fatal, and greatly increases a patient's risk of liver cancer. Defendant's "guidelines" deny Harvoni coverage until and unless Insureds can demonstrate that they have suffered irreparable liver damage, through an F3 or F4 Metavir score (or equivalent scores on a so–called "Fibroscan"). The amount of time it will take an Insured's liver to deteriorate to this level is not predictable, and it is estimated that only 20% of people with hepatitis C will develop F3 or F4 level scarring. *See* http://www.hepatitis.va.gov/patient/faqs/how-does-hepatitisC-progress.asp. That leaves 80% of Defendant's Insureds who do not satisfy Defendant's fraudulent guidelines, as we discuss below.

"treat[ing] the sickest first,"[2] and said it would be cost-effective to provide Harvoni treatment to everyone suffering from hepatitis C, regardless of their degree of liver damage.[3]

8.      Recently, the AASLD updated its guidance to remove the references to "prioritizing" Harvoni treatment that Defendant had misrepresented, and make clear that it "continues to recommend treatment for **all patients** with [hepatitis C], except those with short life expectancies that cannot be remediated by treating [it] . . . ." *See* http://www.hcvguidelines.org/fullreport at page 30. It also recognized that "strong and accumulating evidence argue against deferral" of treatment, and that "[d]eferral practices based on fibrosis stage alone are inadequate and shortsighted." *Id.*

9.      Defendant's "guidelines" have not only been condemned by the medical society on whose report they fraudulently claim to rely, but also by leading experts in the field. For instance, *The New York Times* recently reported that administrators of state Medicaid plans (which include Defendant), had adopted "guidelines" similar to the fraudulent, pretextual "guidelines" at issue in this case. In response, experts from the U.S. Public Health Service and the Presidential Advisory Council on HIV/AIDS recently wrote a letter urging President Obama to take action to end Medicaid restrictions on Harvoni treatment that the experts described as "unreasonable and discriminatory," and

---

[2] *See AASLD Position on Treating Patients with Chronic Hepatitis C Virus*, http://www.aasld.org/aasld-position-treating-patients-chronic-hcv#sthash.7KlZ3Xqv.dpuf (emphasis added).
[3] http://www.bloomberg.com/news/articles/2015-07-13/gilead-pills-priced-at-1-000-a-day-are-found-cost-effective.

"not supported by the medical evidence."[4] A co-chair of the panel that issued the AASLD report, Dr. David Thomas, called the "guidelines" at issue here "astonishing," because Harvoni can "cure most patients with as few as 84 pills" and "[i]t's cheaper to treat patients than to wait for them to develop cirrhosis and complications and then get a liver transplant."[5] He also said that Harvoni "treatments are cost-effective . . . . It is cheaper to treat patients than to wait for them to develop cirrhosis and complications and then get a liver transplant."[6] A public health law expert and professor from Harvard Law School was quoted as saying that "[t]hese criteria defy clinical guidelines and best practices."

10.     It is difficult to overstate the severity of the conduct at issue here. Experts estimate that Defendant's guidelines will ***increase the risk by at least 15%*** that its Insureds will develop liver cancer.[7] The risk is so high that the AASLD recommends testing patients with F3 or F4 levels of liver scarring for hepatocellular carcinoma (liver cancer) every 6 months for the rest of their lives.[8] By covering Harvoni treatment for all its Insureds right now, Defendant could prevent 80% of them from ever suffering the irreparable harm of irreversible liver damage. By fraudulently denying coverage, Defendant has affirmatively chosen to do harm to its Insureds, by forcing them to keep on

---

[4] *See* http://www.nytimes.com/2015/08/26/us/wider-reach-is-sought-for-new-hepatitis-c-treatments.html?_r=0, last visited October 23, 2015.

[5] http://www.nytimes.com/2015/08/26/us/wider-reach-is-sought-for-new-hepatitis-c-treatments.html?_r=2, last visited January 6, 2015 (also noting that "[i]f there were a cure for Alzheimer's or breast cancer that cost $40,000 or $50,000, we would not be having this conversation").

[6] Discovery will show that Defendant's internal deliberations disregarded the fact that it was cost-effective to treat all patients now.

[7] http://www.hepatitis.va.gov/patient/faqs/how-does-hepatitisC-progress.asp.

[8] http://www.hcvguidelines.org/full-report/monitoring-patients-who-are-starting-hepatitis-c-treatment-are-treatment-or-have.

6

suffering until they've suffered permanent liver damage, which will greatly increase their risk of cancer, and require a lifetime of medical monitoring.

11.     The use by Defendant of pretextual, "pre-authorization" criteria that "defy clinical guidelines" and will increase the risk of developing liver cancer by 15% cannot be justified by any clinical evidence. This conduct necessarily violates Defendant's obligations under ERISA.

12.     Lives are at stake here, and Defendant is not selling widgets. It may not simply breach its obligations in order to put off paying a price for Harvoni that it would rather not pay, let alone engage in fraudulent word-mincing that dresses up its scheme in authentic-sounding medical jargon. Plaintiff and many Class Members have suffered for decades, praying that a cure is found before the ravages of hepatitis C result in irreversible liver damage, cancer, or death. A cure has been found, it is medically necessary by any reasonable definition, and Defendant must provide the coverage it promised to provide, or pay the retail costs of obtaining it. Plaintiff and Class Members have suffered long enough.

## THE PARTIES

13.     Plaintiff Eugene Oakes is and was, at all relevant times, a citizen of Florida, residing within this District, in Jupiter, Florida. Plaintiff Oakes was at all relevant times covered under an employee-sponsored health insurance policy governed by ERISA, which promised coverage for medically-necessary treatment in exchange for premium payments.

14.     Defendant Florida Blue is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Florida. It is and was, at all

relevant times, a corporation duly organized and existing under the laws of the State of Florida that is authorized to transact, and is transacting, the business of insurance in the State of Florida, with its principle place of business at 4800 Deerwood Campus Parkway, Jacksonville, FL 32246. Florida Blue is the parent company of a number of subsidiaries and affiliates that provide health insurance and health care services to millions of persons in Florida and elsewhere.

## JURISDICTION AND VENUE

15.    This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 and 1367, and § 502 of ERISA, 29 U.S.C. § 1132.

16.    This Court has personal jurisdiction over Defendant because it is doing business in Florida and has registered with the Florida Secretary of State.

17.    Venue is proper in this forum because at all relevant times, Plaintiff resided in the Southern District of Florida, and a substantial portion of the practices complained of occurred in the Southern District of Florida, and because Defendant has received substantial compensation as a result of doing business in the Southern District of Florida. Moreover, at all times material to the allegations contained herein, Defendant personally or through its agent:

> (a)    operated, conducted, engaged in, and carried on a business venture in the Southern District of Florida or had an office or agency in the Southern District of Florida; and/or
>
> (b)    engaged in substantial activity within this state and district.

18.    Venue also is proper in this district pursuant to 28 U.S.C. § 1391(b).

19.    All conditions precedent to this action have occurred, been performed, or have been waived.

## FACTUAL ALLEGATIONS

**A.    The Contracts of Insurance that Defendant sold to Plaintiff Oakes**

20.    Oakes is covered by employee-sponsored health insurance policy issued by Defendant (the "Oakes Policy"). The Policy promises coverage for medically necessary care in exchange for the payment of premiums. A true and correct copy of the Oakes Policy will be filed forthcoming as **Exhibit A**. In exchange for the benefits promised by the Policy, Oakes pays a monthly premium.

21.    The Policy defines medically necessary care to be that which:

(1)    is appropriate, consistent and necessary for the symptoms, diagnosis or treatment of a medical condition;

(2)    is likely to result in demonstrable medical benefit;

(3)    is not provided primarily for the convenience of the Member, the Member's family, attending or consulting Physician, or other healthcare provider;

(4)    is not custodial or supportive care or rest cures;

(5)    is in accordance with standards of good medical practice in the medical community;

(6)    is approved by the Food and Drug Administration (FDA) or the appropriate medical body or board for the condition in question; and

(7)    is the most appropriate, efficient and economical medical supply, service, level of care or location which can be safely provided to treat the Member.

22.    Harvoni is a covered prescription drug under the Oakes Policy and by any lawful standard of objective reasonableness, Harvoni is medically necessary.

Accordingly, he was and is entitled to coverage for it.

23.     The Policies that Defendant sold to Class Members were uniform and standardized in all material respects that are relevant to Plaintiff's and Class Members' claims.

24.     All Policies that Defendant sold to Class Members contained substantially similar definitions of "medical necessity" set forth in paragraphs 21 above, or contained definitions with immaterial differences. All Policies sold to Class Members promised to cover the cost of hepatitis C treatment where such treatment satisfied the "medical necessity" definition set forth in paragraphs 21 above, or the materially identical definitions in the other Policies.

25.     Plaintiff and Class Members reasonably relied on Defendant's express and implied representations that they would be covered for medically-necessary services.

**B.      Oakes and Class Members are diagnosed with hepatitis C**

26.     The hepatitis C virus was first identified in 1990, although many people were infected with it in the 1970s and 1980s. It is a contagious virus that attacks the liver. An estimated 2.7 million people in the United States have the disease.[9] It is generally transmitted through contact with the blood of an infected person, and before 1992, hepatitis C often was contracted through blood transfusions or transplant surgeries. In 1992, the United States began screening blood utilized in transplants and transfusions for the presence of hepatitis C.

27.     Hepatitis C also can be transmitted from mothers to infants at birth. Several factors influence the likelihood that the virus will be passed from mother to child,

---

[9] CDC, *Viral Hepatitis – Hepatitis C Information*, http://www.cdc.gov/hepatitis/hcv/cfaq.htm.

including the viral load of the mother, the gender of the newborn, and whether there is premature membrane rupture.

28.     Hepatitis C has six different genotypes, or virus classifications, based on the virus's genetic material in RNA strands. Genotype 1 is the most common in the United States, and approximately 75% of Americans with the disease are infected with Genotype 1. All six genotypes of hepatitis C cause liver deterioration and can be fatal. Even before liver deterioration occurs, patients have a heightened risk of heart attack, and suffer from fatigue, joint pain, depression, sore muscles, arthritis, and jaundice. Statistics kept by the U.S. Centers for Disease Control and Prevention (the "CDC") reveal that up to 70% of patients with hepatitis C will develop chronic liver disease, 20% will develop cirrhosis, and 5% will develop liver cancer.

29.     Like other liver diseases, hepatitis C progresses in stages. The usual progression is from inflammation of the liver, to fibrosis of the liver, to cirrhosis of the liver. Cirrhosis can lead to liver failure, liver cancer, or death. Fibrosis is irreversible liver damage and its extent is described in stages, ranging from F0 to F4.[10] A normal liver is designated as stages F0 or F1. A patient in stage F2 suffers from significant fibrosis. A patient in stage F3 suffers from severe fibrosis, and a patient in stage F4 suffers from cirrhosis. Even before suffering irreversible liver damage, persons with hepatitis C can suffer serious health issues, including a high risk of heart attack, fatigue, depression, joint pain, itchy skin, fever, sore muscles, arthritis, and jaundice.

---

[10] A so-called "Metavir score" measures irreversible scarring of the liver in stages, from F0 to F4. Metavir scores are derived from liver biopsies, which themselves are painful and dangerous, especially to persons with hepatitis C.

30.     For years since Plaintiff Oakes was diagnosed with hepatitis C, he has lived with this disease, its deleterious effects, and the well-founded fear that it eventually would destroy his liver and kill him. Like all persons who suffer from this disease, he kept alive the hope that medical science would develop an effective treatment before it was too late. That finally happened in October 2014, when the FDA approved Harvoni.

**C.     The standard of care in the medical community for treating hepatitis C is Harvoni**

31.     Following his diagnosis, Oakes immediately asked his treating physician, Dr. David Dodson, about his prognosis and treatment options. Dr. Dodson advised him that the then-available treatment options caused unbearable side effects.

32.     Specifically, prior to the FDA's approval of Harvoni, the standard of care in the medical community for treating Hepatitis C patients was a three-drug treatment program containing boceprevir, interferon, and ribavirin. The price of this treatment program was $170,000 (twice the price of Harvoni), and provided only a 70% cure rate. In addition, this treatment caused significant adverse side effects, including anemia, insomnia, depression, diarrhea, and memory loss.

33.     On October 10, 2014, the FDA approved Harvoni, a prescription drug that can dramatically improve the lives of those who suffer from hepatitis C. Harvoni is a once daily tablet that contains two drugs, ledipasvir and sofosbuvir, and can completely cure the disease in no more than twelve weeks in 95% to 99% of cases. The length of treatment depends on a patient's condition, particularly the patient's viral load. The viral load refers to the number of viral particles in a person's blood. A patient with a viral load of more than 6 million will remain on Harvoni for twelve weeks. One with a viral load of

12

less than 6 million will remain on Harvoni for eight weeks. A doctor can determine a viral load through a simple blood test.

34.    When the FDA approved Harvoni in 2014, that drug treatment became the standard of care in the medical community. Its efficacy had been tested in three clinical trials on more than 1,500 patients. In those trials, Harvoni cured 95-99% of patients within twelve weeks. In one study of 865 patients with Genotype 1, 99% of individuals who received a twelve-week Harvoni regimen were cured (participants were considered cured if the virus was not detected in their blood three months after the conclusion of the last Harvoni treatment). Another study, involving 440 hepatitis C patients with Genotype 1 who had failed prior treatments, produced astounding results: Harvoni cured 95% of patients without cirrhosis in 12 weeks, and 100% of patients with cirrhosis in 24 weeks.

35.    This revolutionary cure is not only far more effective than all other treatment options, but eliminates the harmful side effects associated with other available treatments such as Sovaldi, a prescription medication utilized in combination with ribavirin. Treatment options other than Harvoni result in severe, unbearable side effects such as nausea, fatigue, anemia, insomnia, anxiety, diarrhea, low red blood cell count, depression, memory loss, and muscle, joint, or bone pain. In contrast, the most severe common side effects associated with Harvoni are tiredness and headaches.

36.    In light of its high success rate and minimal side effects, the FDA designated Harvoni as a ***"breakthrough therapy"*** on October 10, 2014.[11] The FDA reserves its "breakthrough therapy" designation for drugs that are proven to provide

---

[11] *FDA approves first combination pill to treat hepatitis C*, http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm418365.htm (Oct. 10, 2014).

"substantial improvement over available therapies for patients with serious or life-threatening diseases." *Id.*

37.     Hepatitis C is only the second disease or condition for which a cure has been discovered within a single lifespan of the disease or condition's discovery. Hepatitis C was discovered in 1990 and the cure was approved in 2014. Hepatitis C could be completely eradicated in a few years as a result of this miracle cure, assuming patients, such as Plaintiff and Class Members, have access to it.

38.     Defendant uniformly misrepresented to Plaintiff and Class Members that its coverage denials are supported by the AASLD Report. However, the AASLD has expressly disavowed insurers' use of its Report as a pretextual basis to force Insureds to keep suffering when a cure is now available. In what amounts to a first-of-its-kind condemnation of the misuse of such a report, the AASLD issued the following statement:

> Unfortunately payers across America are denying treatment when a doctor has prescribed it for their patient. ***We adamantly disagree with this decision***. Our Guidance is not intended to be used by payers to deny access to treatment. In no way does this position contradict the evidence evaluated to produce the Guidance and the recommendation made in the Guidance to treat the sickest first, but ***recognizes need to treat all***.

*See AASLD Position on Treating Patients with Chronic Hepatitis C Virus*,

http://www.aasld.org/aasld-position-treating-patients-chronic-hcv#sthash.7KlZ3Xqy.dpuf

(emphasis added).

39.     Contrary to Defendant's false representations that the AASLD Report supports their scheme to make Class Members suffer irreparable injury and irreversible liver damage before receiving coverage for Harvoni treatment, the AASLD Report expressly states that: "[e]vidence clearly supports treatment in all BCV-infected persons, except those with limited life expectancy (less than 12 months) due to non-liver-related

comorbid conditions." AASLD, *When and in Whom to Initiate HCV Therapy, Recommendations for Testing, Managing, and Treating Hepatitis C,* http://www.hcvguidelines.org/printpdf/91. In fact, and as noted above, the AASLD recently reaffirmed its position that the evidence supports treating all hepatitis C patients, and expressly concluded that doing so would be cost-effective and removed references to "prioritizing" Harvoni treatment that Defendants had misrepresented. The AASLD reiterated that it "continues to recommend treatment for ***all patients*** with [hepatitis C], except those with short life expectancies that cannot be remediated by treating [it] . . . ." *See* http://www.hcvguidelines.org/fullreport at page 30. It also recognized that "strong and accumulating evidence argue against deferral" of treatment, and that "[d]eferral practices based on fibrosis stage alone are inadequate and shortsighted."

40.     Defendant has ignored (and continues to ignore) the AASLD's express disavowal of its systematic misrepresentation and misuse of the AASLD report, and has continued to require Plaintiff Oakes and Class Members to prove significant, irreversible liver damage before it will approve coverage, including demanding that this damage be demonstrated through costly, painful, and dangerous liver biopsies.

**F.     The Defendant denies Oakes's claim for Harvoni coverage**

41.     On March 3, 2015, Dr. Dodson recommended that Plaintiff Oakes begin Harvoni treatment and promptly requested prior authorization for the medication. In a letter dated August 14, 2015, Defendant denied coverage because Mr. Oakes's liver had not sufficiently deteriorated. In other words, Defendant decided that Mr. Oakes hadn't suffered enough, and his liver hadn't been damaged enough, by a disease that causes irreparable harm and death, for which a cure is finally available. Defendant said it would

15

not consider approving Harvoni for Oakes until a biopsy or Fibroscan demonstrates significant scarring of his liver (severe fibrosis of stage F3 or greater).

42.     Dr. Dodson and Plaintiff Oakes were shocked by Defendant's position that a patient's disease must get worse, and cause irreversible damage and irreparable injury, before it would approve treatment that could arrest the progression of the disease *and prevent that harm*.

43.     Dr. Dodson immediately appealed Defendant's denial. Defendant affirmed their denial in a letter dated September 17, 2015. Oakes has exhausted all administrative remedies. He filed all required internal appeals on his denied claim and his appeal was denied. To the extent any further appeal was available, including an optional external appeal, pursuing such appeals for Oakes or Class Members would have been futile.[12] In the denial letters, Defendant claimed that Harvoni treatment was not medically necessary for Oakes because his liver biopsy did not demonstrate stage F3 or F4 damage. No known medical study supports this denial, and nothing in Oakes's Policy (or any of Class Members' Policies) grants Defendant the right to withhold a potentially life-saving cure, particularly on the perverse and pretextual "basis" that it is not "medically necessary."

44.     Nothing in Oakes's Policy (or the Policies of Class Members) permits Defendant to withhold a potentially life-saving cure until a disease has caused irreparable harm, including liver fibrosis or cirrhosis. Defendant's conduct demonstrates that (1) it

---

[12] To the extent Defendant might argue that any further appeal was required, such would have been futile because Defendant is engaging in a categorical denial for all Insureds who cannot demonstrate F3 or F4-level liver damage. In fact, no level of appeal has the authority to second guess Defendant's fraudulent coverage guidelines, and the appellate board is bound to apply them. If the Insured does not satisfy the guidelines, the appeal is denied, period. The same is true for any optional external appeal. Thus, any appeal would be futile.

prefers for its Insureds with hepatitis C to suffer continuing and irreparable harm before it will authorize treatment that appears all but guaranteed to cure the disease, and (2) it prefers to put profits ahead of patients.

45.     As a result of Defendant's unreasonable and unlawful denial of coverage, Oakes has been denied benefits under his policy, and has been unable to begin the Harvoni treatment, which has demonstrated a 95% to 99% cure rate in cases like his.

46.     To date, Defendant continues to deny Oakes coverage for this breakthrough treatment, demanding that he wait until his medical condition has worsened to the point that irreparable injury has occurred. Absent judicial intervention, significant, irreversible deterioration to Oakes's liver function must occur before Defendant will deign to provide coverage for Harvoni treatment. Specifically, unlike those patients with F0-F2 liver scarring, those who have reached stage F3 or F4 face a higher risk of liver cancer.[13] In fact, the AASLD recommends that patients who have reached F3- or F4-level liver scarring be tested for hepatocellular carcinoma (i.e. liver cancer) every 6 months for the rest of their lives.[14] In other words, instead of treating all hepatitis C patients regardless of liver deterioration, Defendant is forcing Class Members to develop such severe liver scarring that they will require a lifetime of medical monitoring, even if their hepatitis C is cured.

47.     Nothing in Oakes's Policy or the materially identical Policies of Class Members, permits Defendant to deny coverage for a potentially life-saving cure until a disease has caused irreparable injury and irreversible liver damage, including severe

---

[13] http://www.hcvguidelines.org/full-report/monitoring-patients-who-are-starting-hepatitis-c-treatment-are-treatment-or-have.

[14] *Id.*

fibrosis or cirrhosis. Moreover, no clinical criteria supports "prioritizing" treatment based on how much an Insured has suffered from an otherwise incurable disease, let alone the price of a proven miracle cure for that disease.

48.     At bottom, the Oakes Policy, consistent with the Policies of Class Members, promises to provide coverage for medically necessary treatment. The Policies contain a materially identical definition of medical necessity, which is the only criteria Defendant disclosed to Plaintiff and Class Members before sending them letters denying coverage for Harvoni treatment.

49.     Harvoni treatment unquestionably satisfies the operative definition of medical necessity and any lawful standard of objective reasonableness. Nothing in the Policies (or the law) requires Class Members to allow their medical condition to deteriorate to the point of suffering irreparable, severe fibrosis of the liver (or worse) before their doctors' prescribed Harvoni treatment becomes "medically necessary."

50.     Defendant's contractual standard of "medical necessity" is not the standard it applied in denying Oakes's claims (and the claims of other Class Members) for Harvoni treatment. Instead Defendant applied a pretextual and much more restrictive standard (that was inherently fraudulent), which plainly was created to increase profits by limiting Oakes's and Class Members' access to this life-saving medication. Defendant continues to use its pretextual cost-avoidance "criteria" to deny the claims of Class Members, and will do so until ordered to stop.

51.     As a matter of law, Defendant was required to rely on the plain language of Policies to determine coverage eligibility for Harvoni treatment. Defendant flagrantly breached their duties by ignoring that Policy language and denying coverage based on

their pretextual and unlawful cost-avoidance scheme, which served only to elevate profit-seeking over their duties to Plaintiff and Class Members.

52.    The Policies by which Defendant insures Plaintiff (and similarly situated Class Members) are substantially similar in all material respects, are the complete expression of the agreement, and contain materially identical definitions of "medical necessity," or definitions with immaterial differences.

53.    By relying on inherently fraudulent and pretextual, purported "medical criteria" to deny Plaintiff's and other Class Members' claims for coverage for Harvoni treatment, Defendant has breached and is breaching its Policies with Plaintiff and Class Members.

## ERISA ALLEGATIONS

54.    ERISA requires that all employee benefit plans establish and maintain reasonable claims procedures. Specifically, 29 C.F.R. section 2560.503- 1(b)(5) requires that "[t]he claims procedures contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants." 29 C.F.R. § 2560.503-l(b)(5).

55.    Moreover, ERISA only allows claims administrators to rely on internal rules or policies in construing the terms of an employee benefits plan if those rules or policies reasonably interpret the applicable plan.

56.    By issuing coverage guidelines and making coverage determinations on behalf of ERISA-governed insurance plans, Defendant has acted, and is acting, a plan

administrator and its actions give rise to a fiduciary duty on behalf of the ERISA-governed plans that it administers.

57.     In violation of ERISA statutes and regulations, Defendant, as a plan administrator with discretionary authority to determine whether claimants are entitled to benefits under the insurance plan, have systematically ignored the treatment recommendations of Oakes's and Class Members' doctors and used internal clinical guidelines that are inconsistent with the plain language of Oakes' and Class Members' plans. Specifically, Defendant has applied and continues to apply inherently fraudulent guidelines that unlawfully deny coverage for a miracle cure unless and until Oakes and Class Members can demonstrate that they have suffered the irreversible liver damage of F3 fibrosis or F4 stage cirrhosis. This practice is wholly inconsistent with the terms of Oakes's and Class Members' policies, and contravenes 29 C.F.R. section 2560.503-l(b)(5). Defendant's employment of fraudulent guidelines is flatly inconsistent with the "'broadly protective' purposes of ERISA" and would allow Defendant free reign to re-write plan terms and restrict or broaden coverage as they see fit.

## CLASS ALLEGATIONS

### A.     Class Definition

58.     Plaintiff Oakes brings this action against Defendant under Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all other similarly situated persons, and seeks to represent the following Class:

> All persons who are, or were, insured by Defendant or its affiliates, subsidiaries, agents, or entities, under an ERISA governed plan, and (1) have hepatitis C and Stage F0, F1, or F2 fibrosis, (2) have received a prescription from their treating physician for Harvoni, and (3) have been denied coverage for Harvoni treatment by Defendant or their affiliates, subsidiaries, agents, or entities because they do not have Stage F3 or F4 fibrosis.

59.     Plaintiff reserves the right to modify or amend the definitions of the proposed class before the Court determines whether class certification is appropriate.

**B.      Rule 23(a)(1) – Numerosity**

60.     The individual Class Members are so numerous that their individual joinder is impracticable. Defendant sells many thousands of health insurance policies in the state of Florida and throughout the country and, as a general business practice, has failed to comply with applicable law. Moreover, individual Class Members easily can be identified from Defendant's business records, because Defendant knows (a) who the Insureds are, (b) which plans they are insured under, (c) what types of claims they have filed, and (d) how those claims were adjudicated.

61.     On information and belief, the number of Class Members is in the thousands. Their precise number will be determined through discovery, but they are too numerous to be consolidated in one complaint, and it is impractical for each to bring an individual action.

**C.      Rule 23(a)(2) – Commonality**

62.     There are questions of law and fact that are common to Plaintiff's and Class Members' claims.

63.     Common questions of law and fact include, but are not limited to, the following:

(a)     Whether Defendant is engaged in a pattern and practice of denying coverage for Harvoni treatment to Class Members suffering from stage F0, F1, or F2 liver fibrosis;

(b)     Whether Defendant is acting and/or refusing to act on grounds generally

applicable to Plaintiff and Class Members;

(c)     Whether Defendant's pattern and practice of denying coverage for

Harvoni treatment to Plaintiff and Class Members suffering from stage F0,

F1, or F2 liver fibrosis constitutes a wrongful denial of plan benefits under

ERISA;

(d)     Whether Defendant have breached their fiduciary duties under ERISA in

the administration of Plaintiff Oakes's and Class Members' claims for

plan benefits;

(e)     Whether Defendant's misrepresentations as to medical necessity and its

failure to disclose a cost-avoidance scheme intended to disregard the

Policies' definition of medical necessity, and other practices described

above, violated Defendant's fiduciary duties to refrain from

misrepresentations and make truthful disclosures to Plaintiff Oakes and

Class Members;

(f)     Whether Defendant is liable to Plaintiff Oakes and Class Members for

damages and injunctive relief from Defendant's ERISA violations;

64.     The above-identified common questions predominate over questions, if

any, that may affect only individual Class Members.

65.     Defendant subjected Plaintiff and Class Members to the same harm and

did so in the same manner. The conduct described above constitutes Defendant's standard

business practice.

**D.      Rule 23(a)(3) – Typicality**

66.     Defendant's own records demonstrate that Plaintiff is a member of the Class. Plaintiff's claims are typical of the claims of Class Members because they are based on the same legal theories, arise from the similarity, uniformity, and common purpose of Defendant's unlawful conduct, and are not subject to any unique defenses. Members of the Class have sustained, and will continue to sustain, damages in the same manner as Plaintiff as a result of Defendant's wrongful conduct.

67.     Moreover, as to Class Members, Defendant issued and administered many other health insurance policies in which it made promises materially the same as those it made to Oakes—to cover medically-necessary treatment—and engaged in materially identical conduct in wrongfully denying those claims. Thus, the promises, practices, and decisions that Defendant made with respect to Oakes's claim for Harvoni coverage are materially the same as those it made with regard to the claims for Harvoni coverage of Class Members.

**E.      Rule 23(a)(4) – Adequacy of Representation**

68.     Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of its Members. Plaintiff is committed to the vigorous prosecution of this action, and has retained competent counsel who are experienced in litigation of this nature to represent him. There are no conflicts or antagonism between the interests of Plaintiff and the unnamed Class Members.

69.     To prosecute his case, Plaintiff has chosen the law firm of Rivero Mestre LLP, and is obligated to pay a fee for that representation. This firm is experienced in

class action litigation and possesses the financial and legal resources to deal with the costs and legal issues inherent in this action.

**F.     Requirements of Fed. R. Civ. P. 23(b)(3)**

70.     Questions of law or fact common to the Plaintiff's and Class Members' claims predominate over any questions of law or fact affecting only individual Class Members. All claims by Plaintiff and the unnamed Class Members arise from Defendant's common course of unlawful conduct, in breach of the Policies and violation of ERISA. The predominating questions of law and fact include those set forth above in Paragraph 63.

71.     Common issues predominate where, as here, liability can be determined on a class-wide basis, even if there might be the need for some individualized damages determinations. As a result, in determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class, as it is in this case, common questions will be held to predominate over individual questions.

**G.     Superiority**

72.     A class action is superior to individual actions, in part because of the following, non-exhaustive list of factors:

(a)     Individual joinder of all Class Members would impose extreme hardship and inconvenience on them, because they reside all across the nation;

(b)     Individual claims by Class Members are impractical because the cost of pursuing an individual claim could exceed its value. As a result, individual Class Members have no interest in prosecuting and controlling separate actions;

24

(c)     There are no known Class Members who are interested in individually controlling the prosecution of separate actions;

(d)     The interests of justice will be served by resolving the common disputes of all Class Members in one forum;

(e)     Judicial and party resources will be conserved by resolving the common disputes of all Class Members in one forum;

(f)     Individual claims would not be cost effective or economically feasible to pursue through individual actions; and

(g)     The action is manageable as a class action.

**H.     Requirements of Fed. R. Civ. P. 23(b)(1)(a) & 23(b)(2)**

73.     The prosecution of separate actions by (or against) individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendant and any other party opposing the Class.

74.     Defendant has acted or failed to act in a manner generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to all Class Members.

<u>**COUNT I**</u>
**Claim for Improper Denial of Benefits**
**(Applicable to Plaintiff Oakes and Class Members)**

75.     Plaintiff Oakes and Class Members re-allege paragraphs 1 through 74, as if fully set forth here.

76.     This count is brought under 29 U.S.C. § 1132(a).

25

77.     Plaintiff Oakes and Class Members are covered by insurance plans issued by Defendant. Under the terms and conditions of the insurance plans and applicable federal law, Defendant is required to cover and pay for treatment that is medically necessary, which indisputably includes treatment for Harvoni—a miracle cure for a hitherto incurable disease that can cause cancer and death—which is medically necessary under any standard of objective reasonableness.

78.     Defendant is the entity responsible for administering and making benefit determinations under Plaintiff Oakes's and Class Members' health insurance plans, and for developing internal practices and policies that are applied to such determinations. Specifically, Defendant, among other things, exercises discretionary authority or control over the management of the plans, exercise authority or control over management or disposition of the plans' assets, and have the authority to make decisions (and do make decisions) regarding claims for benefits and appeals thereof, including writing checks for coverage.

79.     Defendant wrongfully denied claims submitted by Plaintiff Oakes and Class Members, in furtherance of an unlawful cost-avoidance scheme that employed policies and practices that are inconsistent with the relevant terms of Oakes's and Class Members' health insurance plans and ERISA.

80.     Defendant's improper denials have caused damage to Plaintiff Oakes and Class Members in the form of uncovered and unreimbursed claims for Harvoni treatment.

81.     Pursuant to 29 U.S.C. § 1132(a)(3), Plaintiff Oakes and Class Members have a right to injunctive relief and damages, together with attorneys' fees and costs.

26

## COUNT II
### Violation of Fiduciary Obligations under ERISA
### (Applicable to Plaintiff Oakes and Class Members)

82.     Plaintiff Oakes and Class Members re-allege paragraphs 1 through 74, as if fully set forth here.

83.     This Count is brought under 29 U.S.C. § 1132(a) and is distinct from the relief sought under Count I. Specifically, this Count seeks to redress Defendant's systematic, plan-wide claims administration problems relating to its wrongful use of inherently fraudulent and pretextual coverage guidelines. Relief under Count I will not change the fact that Defendant is using an improper methodology for processing Harvoni claims.

84.     As the entity responsible for making benefit determinations under Plaintiff Oakes's and Class Members' health insurance plans, and for developing internal practices and policies that are applied to such determinations, Defendant is an ERISA fiduciary within the meaning of 29 U.S.C. § 1109(a) and 1002(21)(A). Specifically, Defendant, among other things, exercises discretionary authority or control over the management of the plans, exercises authority or control over management or disposition of the plans' assets, and has the authority to make decisions (and does make decisions) regarding claims for benefits and appeals thereof, including writing checks for coverage.

85.     As an ERISA fiduciary, Defendant owed Plaintiff Oakes and Class Members numerous fiduciary duties, including the duty to make decisions in accordance with plan terms and ERISA requirements.

86.     Notwithstanding these fiduciary obligations, Defendant developed and relied on an inherently fraudulent cost-avoidance scheme and pre-authorization

27

"guidelines" that improperly restricted coverage in contravention of Plaintiff Oakes's and Class Members' health insurance plan terms and ERISA requirements. In doing so, Defendant violated their fiduciary obligations.

87.    Plaintiff Oakes and Class Members have been harmed by Defendant's breaches of fiduciary duty, because their claims have been subjected to inherently fraudulent and unlawful restrictions that are not part of the health insurance plans at issue, which violates ERISA.

88.    Pursuant to 29 U.S.C. § 1132(a)(3), Plaintiff Oakes and Class Members have a right to injunctive relief and damages, together with attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on his own behalf and on behalf of all similarly situated persons (as defined above), demands judgment against Defendant as follows:

(1)    Declaring (1) that this action is a proper class action maintainable under Rule 23(a), and one or more of Rules 23(b)(1)(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, (2) that Plaintiff shall serve as class representative, and (3) that Rivero Mestre LLP shall serve as counsel for the Class;

(2)    Declaring that Defendant's cost-avoidance scheme and fraudulent coverage guidelines are contrary to, and in violation of, the terms of ERISA;

(3)    Ordering Defendant to recalculate and issue unpaid benefits to Plaintiff Oakes and Class Members, whose claims were denied as a result of Defendant's unlawful conduct;

(4)     Awarding injunctive relief to Plaintiff Oakes and Class Members (under 29 U.S.C. § 1132(a)(3)), enjoining Defendant from using hidden, cost-based criteria to deny coverage of medically-necessary Harvoni treatment in furtherance of an unlawful cost-avoidance scheme;

(5)     Awarding Plaintiff Oakes and Class Members damages resulting from Defendant's breaches of fiduciary duties under ERISA, together with attorneys' fees and costs of suit, pursuant to 29 U.S.C. § 1132(g);

(6)     Awarding Plaintiff and Class Members their costs and disbursements, and reasonable allowances for expert fees and reimbursement of expenses, including reasonable attorney's fees, in amounts to be determined by the Court; and

(7)     Awarding such other and further relief as the interests of justice require.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class request a trial by jury of any and all Counts for which a jury trial is permitted by law.

Respectfully submitted on January 7, 2016

> RIVERO MESTRE LLP
> *Attorneys for Plaintiff and the Class*
> 2525 Ponce de Leon Blvd., Suite 1000
> Miami, Florida 33134
> Telephone:  (305) 445-2500
> Facsimile:   (305) 445-2505
> E-mail: arivero@riveromestre.com
> E-mail: arolnick@riveromestre.com
> E–mail: jmestre@riveromestre.com
> E–mail: cwhorton@riveromestre.com
> E-mail: dsox@riveromestre.com
> Secondary: mferguson@riveromestre.com
>
> By:   /s/ Andrés Rivero
>       ANDRÉS RIVERO
>       Florida Bar No. 613819
>       JORGE A MESTRE
>       Florida Bar No. 088145
>       ALAN H. ROLNICK
>       Florida Bar No. 715085
>       CHARLES E. WHORTON
>       Florida Bar No. 46894
>       DANIEL A. SOX
>       Florida Bar No. 108573

## CERTIFICATE OF SERVICE

I certify that on January 7, 2016, I electronically filed this document with the Clerk of the Court using CM/ECF.

> s/ Andrés Rivero
> ANDRÉS RIVERO