## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No.: 9:16-CV-80028-ROSENBERG/BRANNON

EUGENE OAKES and KEITH BURT,
Individually and on behalf of a class of
similarly situated persons,

       Plaintiff,

v.

BLUE CROSS AND BLUE SHIELD
OF FLORIDA, INC., d/b/a/ FLORIDA
BLUE,

       Defendant.

_____/

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs Eugene Oakes and Keith Burt, individually and on behalf of a class of similarly situated persons, file this Amended Class Action Complaint against Defendant Blue Cross and Blue Shield of Florida, Inc. ("BC Florida").

## INTRODUCTION

This case arises from Defendant's uniformly unlawful conduct, which has uniformly injured thousands of people in exactly the same way. Defendant's unlawful conduct is embodied in, and carried out through, a fraudulent scheme to deny paid-for health insurance coverage of a miracle cure for a hitherto incurable, debilitating, degenerative and potentially fatal disease. The disease is hepatitis C, and the cure is Harvoni, which cures 95% of cases in as little as six to eight weeks, and is "medically necessary" as a matter of law. Plaintiffs Eugene Oakes and Keith Burt and other similarly situated persons (the "ERISA Class Members" or "Class Members") seek damages and

injunctive relief for Defendant's violations of the Employee Retirement and Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1169.

## NATURE OF THE ACTION

1.     All medical professionals, and all who work with them, including health insurers, learn that the first rule of medicine is to "do no harm." This case arises not merely from Defendant's callous indifference to doing harm, but from its ***deliberate choice to do harm***, in order to maximize profits by avoiding costs. Defendant has intentionally chosen to inflict irreparable harm on its insureds instead of preventing it.

2.     Defendant BC Florida markets, sells, and administers health insurance contracts (the "Policies") to thousands of people in Florida and across the nation who suffer from hepatitis C (the "Insureds"), who have the right to rely on Defendant to handle their health insurance claims with the utmost good faith.

3.     Defendant, acting in concert with others, is engaged in an unlawful pattern and practice of using inherently fraudulent, pretextual "cost-avoidance" criteria to deny coverage for a miracle cure of a hitherto incurable disease to Plaintiffs and thousands of similarly situated Insureds who have hepatitis C but have not yet suffered irreversible, life-threatening liver damage from it (collectively, the "Class" or "Class Members"). Defendant's wrongful conduct has caused serious harm, and threatens to cause irreparable harm, to Plaintiffs and the Class.

4.     Hepatitis C is a debilitating, degenerative disease that causes serious health problems, including irreparable liver damage, infections, cancer, and death. Hepatitis C is the leading cause of cirrhosis—a disease in which healthy liver tissue is replaced with scar tissue, which prevents the liver from functioning properly and can lead

to liver failure and liver cancer. Even before suffering irreversible liver damage, persons with hepatitis C can suffer serious health issues, including a high risk of heart attack, fatigue, depression, joint pain, itchy skin, fever, sore muscles, arthritis, and jaundice.

5.     Until recently, there was no effective treatment, let alone cure, for hepatitis C. In October 2014, the U.S. Food and Drug Administration ("FDA") approved Harvoni, calling it a "breakthrough drug," because it can cure hepatitis C in a remarkable 95% to 99% of cases. Harvoni is taken once daily in pill form. It can eradicate hepatitis C and cure the patient in as little as six to eight weeks with few side effects. Since October 2014, Harvoni has been the medical community's standard of care for treating hepatitis C. The manufacturer has priced Harvoni at approximately $99,000 for a 12-week treatment in the United States, but insurers, including BC Florida, have obtained it at deep discounts.

6.     In Policy and Policy-related disclosures to Plaintiffs and Class Members that are uniform in all material respects, Defendant consistently, expressly, and uniformly misrepresented that coverage and treatment decisions under the Policies are made on the basis of "medical necessity." As a matter of law and logic, a miracle cure for a hitherto incurable, potentially fatal disease is medically necessary. But contrary to Defendant's express representations, and in furtherance of a common, unlawful scheme, Defendant, acting in concert with others, is and has been systematically and continuously breaching its promises, by intentionally misrepresenting and failing to disclose that it will not provide this medically necessary coverage unless it furthers Defendant's cost-avoidance scheme, whose goal is to deny Harvoni coverage to 80% of Defendant's Insureds who suffer from hepatitis C but have not yet suffered irreparable liver damage. The

"guidelines" purport to do that by limiting coverage for Harvoni treatment to Insureds who can demonstrate that they already have suffered irreparable liver damage, in the form of severe fibrosis or cirrhosis, by submitting to a painful and dangerous liver biopsy that results in a so-called "Metavir score" of F3 or F4.[1]

7.     To carry out and conceal its unlawful scheme, Defendant attempted to put it into a plausible medical disguise, by the misuse of pretextual, coverage "guidelines" that require Insureds to first suffer, then demonstrate, irreparable liver damage, before Defendant will provide coverage. These "guidelines" are inherently fraudulent and an attempt to cover up Defendant's scheme to avoid paying Harvoni claims for 80% of its Insureds. Seldom is fraud as obvious (and egregious) as it is here, where Defendant attempted to justify its "guidelines" by misrepresenting a report from the American Association for the Study of Liver Diseases (the "AASLD"—whose report will be referred to herein as the "AASLD Report"). When the AASLD learned that Defendant and other health insurers were using its Report as a basis to force Insureds to suffer irreparable harm, it publicly condemned that misuse of its Report, "adamantly disagreed"

---

[1] A Metavir score measures liver scarring, which is irreversible, i.e., irreparable. An F0 or F1 score generally denotes an unscarred liver, while an F2 score denotes significant scarring (fibrosis). This test cannot reliably distinguish between F2 and F3 (severe fibrosis), while an F4 score indicates cirrhosis, which itself can be fatal, and greatly increases a patient's risk of liver cancer. Defendant's "guidelines" deny Harvoni coverage until and unless Insureds can demonstrate that they have suffered irreparable liver damage, through an F3 or F4 Metavir score (or equivalent scores on a so–called "Fibroscan"). The amount of time it will take an Insured's liver to deteriorate to this level is not predictable, and it is estimated that only 20% of people with hepatitis C will develop F3 or F4 level scarring. *See* http://www.hepatitis.va.gov/patient/faqs/how-does-hepatitisC-progress.asp. That leaves 80% of Defendant's Insureds who do not satisfy Defendant's fraudulent guidelines, as we discuss below.

with the insurers' current practice of "treat[ing] the sickest first,"[2] and stated that it would be cost-effective to provide Harvoni treatment to everyone suffering from hepatitis C, regardless of their degree of liver damage.[3]

8.      To leave no doubt, the AASLD recently updated its Report to remove references to "prioritizing" Harvoni treatment, which Defendant had misrepresented, and make clear that it "continues to recommend treatment for **_all patients_** with [hepatitis C], except those with short life expectancies that cannot be remediated by treating [it] . . . ." *See* http://www.hcvguidelines.org/fullreport at page 30. The updated Report also stated that "strong and accumulating evidence argue against deferral" of treatment, and that "[d]eferral practices based on fibrosis stage alone are inadequate and shortsighted." *Id.*

9.      Defendant's "guidelines" have not only been condemned by the medical society on whose report they fraudulently claim to rely, but also by leading experts in the field. For instance, *The New York Times* recently reported that administrators of state Medicaid plans (which include Defendant), had adopted "guidelines" similar to the

---

[2] *See AASLD Position on Treating Patients with Chronic Hepatitis C Virus*, http://www.aasld.org/aasld-position-treating-patients-chronic-hcv#sthash.7KlZ3Xqy.dpuf (emphasis added).

[3] http://www.bloomberg.com/news/articles/2015-07-13/gilead-pills-priced-at-1-000-a-day-are-found-cost-effective. Beginning in 2012, promising trial results of Harvoni treatment caused many doctors to eschew existing treatments for hepatitis C, which had spotty success rates and serious side effects. Thus, many Insureds were "warehoused," waiting for Harvoni to become available, during the same time period that Defendant was scheming to avoid covering it. When the drug was approved in October 2014 and the "warehousing" stopped, Defendant seized on the natural tendency to treat the most advanced cases first, which it perverted and fraudulently misused as an excuse for denying coverage to the remaining 80% of its Insureds with hepatitis C. But the AASLD Report never said that Harvoni should be "rationed," let alone that there was any medical, much less lawful, basis for "treat[ing] the sickest first." Since the day it came on the market, there has never been a shortage of Harvoni, only a shortage of Defendant's willingness to do what the law requires and cover it.

fraudulent, pretextual "guidelines" at issue herein. In response, experts from the U.S.
Public Health Service and the Presidential Advisory Council on HIV/AIDS recently
wrote a letter urging President Obama to take action to end Medicaid restrictions on
Harvoni treatment that the experts described as "unreasonable and discriminatory," and
"not supported by the medical evidence."[4] A co-chair of the panel that issued the AASLD
Report, Dr. David Thomas, called Harvoni "astonishing," because it can "cure most
patients with as few as 84 pills."[5] He also said that Harvoni "treatments are cost-effective
. . . . It is cheaper to treat patients than to wait for them to develop cirrhosis and
complications and then get a liver transplant."[6] A public health law expert and professor
from Harvard Law School was quoted as saying that "[t]hese criteria defy clinical
guidelines and best practices."[7]

10.     It is difficult to overstate the severity of the conduct at issue. Experts
estimate that Defendant's guidelines will ***increase the risk by at least 15%*** that its
Insureds will develop liver cancer.[8] The risk is so high that the AASLD recommends
testing persons with F3 or F4 levels of liver scarring (the only Insureds whose Harvoni
prescriptions Defendant will approve), for hepatocellular carcinoma (liver cancer) every
6 months for the rest of their lives, i.e., ***after*** Harvoni treatment has cured their hepatitis

---

[4] *See* http://www.nytimes.com/2015/08/26/us/wider-reach-is-sought-for-new-hepatitis-c-treatments.html?_r=0, last visited October 23, 2015.

[5] http://www.nytimes.com/2015/08/26/us/wider-reach-is-sought-for-new-hepatitis-c-treatments.html?_r=2, last visited January 6, 2015 (also noting that "[i]f there were a cure for Alzheimer's or breast cancer that cost $40,000 or $50,000, we would not be having this conversation").

[6] *Id.* Discovery will show that Defendant's internal deliberations disregarded the fact that it was cost-effective to treat all patients now.

[7] *Id.*

[8] http://www.hepatitis.va.gov/patient/faqs/how-does-hepatitisC-progress.asp.

C.[9] By covering medically necessary Harvoni treatment for all Insureds right now, Defendant would prevent 80% of them from ever suffering the irreparable harm of irreversible liver damage. By fraudulently denying coverage, Defendant has affirmatively chosen to do harm to its Insureds, by forcing them to keep on suffering until they've suffered permanent liver damage, which will greatly increase their risk of cancer, and require a lifetime of medical monitoring after they finally get Harvoni treatment and are cured of hepatitis C.

11.     The use by Defendant of pretextual, "pre-authorization" criteria that "defy clinical guidelines," which will inflict irreparable liver damage on the Insureds and greatly increase their risk of developing liver cancer, cannot be justified by any clinical evidence. This conduct violates Defendant's ERISA obligations as a matter of law.

12.     Lives are at stake here, and Defendant is not selling widgets. It may not breach its duties to Insureds in order to avoid paying for Harvoni treatment, let alone engage in fraudulent word-mincing that dresses up its scheme in authentic-sounding medical jargon. Plaintiffs and many Class Members have suffered for decades, praying that a cure is found before the ravages of hepatitis C result in irreversible liver damage, cancer, or death. A cure has been found. It is medically necessary by any objective definition (including the definition in the Policies), and Defendant must provide the coverage it promised to provide, or pay the retail costs of obtaining it, together with such other relief as is necessitated by its wrongful conduct. Plaintiffs and Class Members have suffered long enough.

---

[9] http://www.hcvguidelines.org/full-report/monitoring-patients-who-are-starting-hepatitis-c-treatment-are-treatment-or-have.

## THE PARTIES

13.     Plaintiff Eugene Oakes is and was, at all relevant times, a citizen of Florida, residing within this District, in Jupiter, Florida. Plaintiff Oakes was at all relevant times covered under an employee-sponsored health insurance Policy issued by Defendant and governed by ERISA, which promises coverage for medically-necessary treatment in exchange for premium payments.

14.     Plaintiff Keith Burt is and was, at all relevant times, a citizen of Florida, residing in Panama City, Florida. Plaintiff Burt was at all relevant times covered under an employee-sponsored health insurance Policy issued by Defendant and governed by ERISA, which promises coverage for medically-necessary treatment in exchange for premium payments.

15.     Defendant BC Florida is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Florida. It is and was, at all relevant times, a corporation duly organized and existing under the laws of the State of Florida that is authorized to transact, and is transacting, the business of insurance in the State of Florida, with its principle place of business at 4800 Deerwood Campus Parkway, Jacksonville, FL 32246.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1367, and Section 502 of ERISA, 29 U.S.C. § 1132.

17.     This Court has personal jurisdiction over Defendant because Defendant is a Florida corporation that is domiciled in Florida, does business in Florida and is registered with Florida's Secretary of State.

8

18.     Venue is proper in the Southern District of Florida because, at all relevant times, Plaintiff Oakes resided in this District, a substantial portion of the events and omissions giving rise to this action occurred in this District (28 U.S.C. § 1391(b)(2)), and Defendant does business in this District, from which it receives substantial compensation (28 U.S.C § 1391(d)). At all times material to the allegations contained herein, Defendant personally or through its agent(s):

(a)     operated, conducted, engaged in, and carried on a business venture in the Southern District of Florida or had an office or agency in this District; and/or

(b)     engaged in substantial activity within Florida and this District.

19.     Venue also is proper in the Southern District of Florida pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), because this is the District where the breach took place, or where Defendant resides or may be found.

20.     All conditions precedent to this action have occurred, been performed, or have been waived.

## FACTUAL ALLEGATIONS

**A.     The Contracts of Insurance that Defendant sold to Plaintiffs Oakes and Burt**

21.     Oakes is covered by an employee-sponsored health insurance Policy issued by Defendant (the "Oakes Policy"). The Policy promises coverage for medically necessary healthcare services in exchange for the payment of premiums. A true and correct copy of the Oakes Policy is attached hereto as **Exhibit A.**

22.     The Oakes Policy defines medically necessary healthcare services to be:

(1)     consistent with the symptom, diagnosis, and treatment of the condition being treated;

(2)    widely accepted by the practitioner's peer group as efficacious and reasonably safe based on the scientific evidence;

(3)    universally accepted in clinical use such that omission of the service in these circumstances raise questions regarding the accuracy of diagnosis or the appropriateness of the treatment;

(4)    not Experimental or Investigational;

(5)    not for cosmetic purposes;

(6)    not primarily for the convenience of, the covered person's family, the Physician or other provider;

(7)    The most appropriate level of service or care which can safely be provided to the Covered Person; and

(8)    in the case inpatient care, the Health Care Service(s) cannot be provided safely in an alternative setting.

*See* Oakes Policy at 23-9.

23.    Burt is covered by an employee-sponsored health insurance policy issued by Defendant (the "Burt Policy"). The Policy promises coverage for medically necessary healthcare services in exchange for the payment of premiums. A true and correct copy of the Burt Policy is attached hereto as **Exhibit B.**

24.    The Burt Policy defines medically necessary healthcare services to be:

(1)    in accordance with Generally Accepted Standards of Medical Practice;

(2)    clinically appropriate, in terms of type, frequency, extent, site of Service, duration, and considered effective for your illness, injury, or disease or symptoms;

(3)    not primarily for your convenience, your family's convenience, your caregiver's convenience or that of your Physician or other health care provider, and

(4)    not more costly than the same or similar Service provided by a different Provider, by way of a different method of administration, and alternative location (e.g., office vs. inpatient), and/or an alternative Service or sequence of Services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of your illness, injury, disease or symptoms.

*See* Burt Policy at 21-11.

25.     Coverage for Harvoni treatment is medically necessary as that term is defined in the Oakes and Burt Policies, and by any lawful standard of objective reasonableness. Accordingly, Oakes and Burt were (and are) entitled to coverage for it.

26.     The Policies that Defendant sold to Plaintiffs and Class Members were uniform and standardized in all material respects that are relevant to Plaintiffs' and Class Members' claims.

27.     All Policies that Defendant sold to Class Members contained substantially similar definitions of "medical necessity" set forth in paragraphs 22 and 24 above, or contained definitions with immaterial differences. All Policies sold to Class Members promised to cover the cost of hepatitis C treatment where such treatment satisfied the "medical necessity" definition set forth in paragraphs 22 and 24 above, or the materially identical definitions in the other Policies.

28.     Plaintiffs and Class Members reasonably relied on Defendant's express and implied representations that they would be covered for medically necessary health care services.

**B.      Oakes, Burt, and Class Members are diagnosed with hepatitis C**

29.     The hepatitis C virus was first identified in 1990, although many people were infected with it in the 1970s and 1980s. It is a contagious virus that attacks the liver. An estimated 2.7 million people in the United States have the disease.[10] It is generally transmitted through contact with the blood of an infected person, and before 1992, hepatitis C often was contracted through blood transfusions or transplant surgeries. In

---

[10] CDC, *Viral Hepatitis – Hepatitis C Information*, http://www.cdc.gov/hepatitis/hcv/cfaq.htm.

1992, the United States began screening blood utilized in transplants and transfusions for the presence of hepatitis C.

30.     Hepatitis C also can be transmitted from mothers to infants at birth. Several factors influence the likelihood that the virus will be passed from mother to child, including the viral load of the mother, the gender of the newborn, and whether there is premature membrane rupture.

31.     Hepatitis C has six different genotypes, or virus classifications, based on the virus's genetic material in RNA strands. Genotype 1 is the most common in the United States, and approximately 75% of Americans with the disease are infected with Genotype 1. All six genotypes of hepatitis C cause liver deterioration and can be fatal. Even before liver deterioration occurs, patients have a heightened risk of heart attack, and suffer from fatigue, joint pain, depression, sore muscles, arthritis, and jaundice. Statistics kept by the U.S. Centers for Disease Control and Prevention (the "CDC") reveal that up to 70% of patients with hepatitis C will develop chronic liver disease, 20% will develop cirrhosis, and 5% will develop liver cancer.

32.     Like other liver diseases, hepatitis C progresses in stages. The usual progression is from inflammation of the liver, to fibrosis of the liver, to cirrhosis of the liver. Fibrosis is the excessive accumulation of scar tissue that results from ongoing inflammation and cell death within the liver of a person who suffers from chronic liver disease, such as hepatitis C. It is irreversible damage and its extent is described in stages, ranging from F0 to F4.[11] A normal liver is designated as stage F0 or F1. A patient in stage

---

[11] A so-called "Metavir score" measures irreversible scarring of the liver in stages, from F0 to F4. Metavir scores are derived from liver biopsies, which themselves are painful and dangerous, especially to persons with hepatitis C.

F2 suffers from significant fibrosis. A patient in stage F3 suffers from severe fibrosis, and a patient in stage F4 suffers from cirrhosis. Cirrhosis can lead to liver failure, liver cancer, or death. Even before suffering irreversible liver damage, persons with hepatitis C often suffer from serious health issues, including a high risk of heart attack, fatigue, depression, joint pain, itchy skin, fever, sore muscles, arthritis, and jaundice.

33.     For years since Plaintiffs Oakes, Burt and Class Members were diagnosed with hepatitis C, they have lived with this disease, its debilitating and degenerative effects, and the well-founded fear that it eventually would destroy their livers and kill them. Like all persons who suffer from this virus, they kept alive the hope that medical science would develop an effective treatment before it was too late. That finally happened in October 2014, when the FDA approved Harvoni.

**C.     The standard of care in the medical community to treat hepatitis C is Harvoni**

34.     Following his diagnosis, Plaintiff Oakes immediately asked his treating physician, Dr. David Dodson, about his prognosis and treatment options. Dr. Dodson advised him that the then-available treatment options caused serious side effects. When Plaintiff Burt sought treatment, he and his doctor opted for a course of treatment with interferon and ribavirin, which was unsuccessful.

35.     Prior to the FDA's approval of Harvoni, the standard of care in the medical community for treating Hepatitis C patients was a three-drug treatment program containing boceprevir, interferon, and ribavirin. The price of this treatment program was $170,000 (twice the price of Harvoni), and provided only a 70% cure rate. In addition, this treatment caused significant adverse side effects, including anemia, insomnia, depression, diarrhea, and memory loss.

36.    On October 10, 2014, the FDA approved Harvoni, a prescription drug that can dramatically improve the lives of those who suffer from hepatitis C, by curing it in virtually all cases. Harvoni is a once-daily tablet that contains two drugs, ledipasvir and sofosbuvir, and can completely cure the disease in no more than twelve weeks in 95% to 99% of cases. The length of treatment depends on a patient's condition, particularly the patient's viral load. The viral load refers to the number of viral particles in a person's blood. A patient with a viral load of more than 6 million will remain on Harvoni for twelve weeks. One with a viral load of less than 6 million will remain on Harvoni for eight weeks. A doctor can determine a viral load through a simple blood test.

37.    When the FDA approved Harvoni in 2014, that drug treatment became the standard of care in the medical community. Its efficacy had been tested in three clinical trials on more than 1,500 patients. In those trials, Harvoni cured 95-99% of patients within twelve weeks. In one study of 865 patients with Genotype 1, 99% of individuals who received a twelve-week Harvoni regimen were cured (participants were considered cured if the virus was not detected in their blood three months after the conclusion of the last Harvoni treatment). Another study, involving 440 hepatitis C patients with Genotype 1 who had failed prior treatments, produced astounding results: Harvoni cured 95% of patients without cirrhosis in 12 weeks, and 100% of patients with cirrhosis in 24 weeks.

38.    This revolutionary cure is not only far more effective than all other treatment options, but eliminates the harmful side effects associated with other available treatments such as Sovaldi, a prescription medication utilized in combination with ribavirin. Treatment options other than Harvoni cause severe, and in many cases unbearable, side effects including nausea, fatigue, anemia, insomnia, anxiety, diarrhea,

low red blood cell count, depression, memory loss, and muscle, joint, or bone pain. In contrast, the most severe common side effects associated with Harvoni are tiredness and headaches.

39.     In light of Harvoni's high success rate and minimal side effects, the FDA designated it as a *"breakthrough therapy"* on October 10, 2014.[12] The FDA reserves its "breakthrough therapy" designation for drugs that are proven to provide "substantial improvement over available therapies for patients with serious or life-threatening diseases." *Id.*

40.     Hepatitis C is the first disease or condition for which a cure has been discovered within a single generation of its discovery. Hepatitis C was discovered in 1990 and the cure was approved in 2014. Hepatitis C could be completely eradicated in a few years as a result of this miracle cure, assuming patients, such as Plaintiffs and Class Members, have access to it.

41.     Rather than cover this miracle drug, Defendant have categorically denied coverage for Harvoni unless an insured suffers, then demonstrates, F3 or F4-level liver scarring. Defendant uniformly misrepresents to Plaintiffs and Class Members that its coverage denials are supported by the AASLD Report. However, the AASLD has expressly disavowed insurers' use of its Report as a pretextual basis to force Insureds to keep suffering when a cure is now available. In what amounts to a first-of-its-kind condemnation of the misuse of such a report, the AASLD issued the following statement:

> Unfortunately payers across America are denying treatment when a doctor has prescribed it for their patient. ***We adamantly disagree with this***

---

[12] *FDA approves first combination pill to treat hepatitis C*, http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm418365.htm (Oct. 10, 2014).

> *decision*. Our Guidance is not intended to be used by payers to deny access to treatment. In no way does this position contradict the evidence evaluated to produce the Guidance and the recommendation made in the Guidance to treat the sickest first, but *recognizes need to treat all*.

See *AASLD Position on Treating Patients with Chronic Hepatitis C Virus*,

http://www.aasld.org/aasld-position-treating-patients-chronic-hcv#sthash.7KlZ3Xqy.dpuf

(emphasis added).

42.     Contrary to Defendant's false representations that the AASLD Report supports their scheme to make Class Members suffer irreparable injury and irreversible liver damage before receiving coverage for Harvoni treatment, the AASLD Report expressly states that: "[e]vidence clearly supports treatment in all HCV-infected persons, except those with limited life expectancy (less than 12 months) due to non-liver-related comorbid conditions." AASLD, *When and in Whom to Initiate HCV Therapy, Recommendations for Testing, Managing, and Treating Hepatitis C*,

http://www.hcvguidelines.org/printpdf/91. In fact, and as noted above, the AASLD recently reaffirmed its position that the evidence supports treating all hepatitis C patients, and expressly concluded that doing so would be cost-effective and removed references to "prioritizing" Harvoni treatment that Defendants had misrepresented.[13] The AASLD reiterated that it "continues to recommend treatment for *all patients* with [hepatitis C], except those with short life expectancies that cannot be remediated by treating [it] . . . ." See http://www.hcvguidelines.org/fullreport at page 30. It also recognized that "strong

---

[13] As noted above (*supra*, note 3), the rejection of riskier, less-effective treatments caused a "warehousing" of patients waiting for Harvoni's approval during its testing. When approval came, it was natural to suggest that the backlog of cases should be addressed by treating the most advanced cases immediately. Because there was no shortage of the new medicine, it was inherently fraudulent for Defendant to misrepresent (and pervert) that suggestion in an attempt to justify not treating everyone else.

and accumulating evidence argue against deferral" of treatment, and that "[d]eferral practices based on fibrosis stage alone are inadequate and shortsighted."

43.     Defendant has ignored (and continues to ignore) the AASLD's express disavowal of Defendant's intentional, class-wide misrepresentation and misuse of the AASLD report, and has continued to require Plaintiffs Oakes, Burt and Class Members to first suffer, then demonstrate, serious and irreparable liver damage before it will approve Harvoni coverage, including the requirement that this irreparable damage be demonstrated through costly, painful, and dangerous liver biopsies.

**D.     Defendant denies Oakes' and Burt's claims for Harvoni coverage**

44.     On March 3, 2015, Dr. Dodson recommended that Plaintiff Oakes begin Harvoni treatment and promptly requested prior authorization for the medication. In a letter dated August 14, 2015, Defendant denied coverage because Mr. Oakes' liver had not sufficiently deteriorated. In other words, Defendant decided that Mr. Oakes hadn't suffered enough, and his liver hadn't been damaged enough, by a disease that causes irreparable harm and death, for which a cure is finally available. Defendant said it would not consider approving Harvoni for Oakes until a biopsy or Fibroscan demonstrates significant scarring of his liver (severe fibrosis of stage F3 or greater).

45.     Dr. Dodson and Plaintiff Oakes were shocked by Defendant's position that a patient's disease must get worse, and cause irreversible damage and irreparable injury, before it would approve treatment that could arrest the progression of the disease **_and prevent that harm_**.

46.     Dr. Dodson immediately appealed Defendant's denial. Defendant affirmed its denial in a letter dated September 17, 2015. Oakes has exhausted all administrative

remedies. He filed all required internal appeals on his denied claim and his appeal was denied. To the extent any further appeal was available, including an optional external appeal, pursuing such appeals for Oakes or Class Members would have been futile.[14] In the denial letters, Defendant claimed that Harvoni treatment was not medically necessary for Oakes because his liver biopsy did not demonstrate stage F3 or F4 damage. No known medical study supports this denial, and nothing in Oakes' Policy (or any of Class Members' Policies) grants Defendant the right to withhold a potentially life-saving cure, particularly on the perverse and pretextual "basis" that it is not "medically necessary."

47.     Plaintiff Burt's doctor prescribed Harvoni for him in June 2015. In July 2015, Defendant denied coverage because Mr. Burt's liver had not sufficiently deteriorated. As with Plaintiff Oakes and all Class Members, Defendant decided that Mr. Burt hadn't suffered enough, and his liver hadn't been damaged enough, to make Harvoni treatment medically necessary.

48.     Plaintiff Burt and his doctor were shocked by Defendant's position that a patient's disease must get worse, and cause irreversible damage and irreparable injury, before it would approve treatment that could arrest the progression of the disease *and prevent that harm*.

49.     Plaintiff Burt and his doctor immediately appealed Defendant's denial of coverage. In a letter dated January 28, 2016, Defendant affirmed its denial and decision

---

[14] To the extent Defendant might argue that any further appeal was required for any plaintiff or Class Member, such would have been futile because Defendant is engaging in a categorical denial for all Insureds who cannot demonstrate F3 or F4 levels of liver damage. In fact, no level of appeal has the authority to second guess Defendant's fraudulent coverage guidelines, and the appellate board is bound to apply them. If an Insured does not satisfy the guidelines, the appeal is denied, period. The same is true for any optional external appeal. Thus, any appeal would be futile.

to refuse treatment until Burt first suffers, then demonstrates, severe fibrosis, through a Metavir score of F3 or worse.

50.     Nothing in Oakes' Policy, Burt's Policy (or the Policies of Class Members) permits Defendant to withhold a potentially life-saving cure until a disease has caused irreparable harm, including liver fibrosis or cirrhosis. Defendant's conduct demonstrates that (1) it prefers for its Insureds with hepatitis C to suffer continuing and irreparable harm before it will authorize treatment that appears all but guaranteed to cure the disease, and (2) it prefers to put profits ahead of patients (to whom it owes fiduciary duties).

51.     As a result of Defendant's unreasonable and unlawful denial of coverage, Oakes, Burt and Class Members have been denied benefits required by their Policies, and have been unable to begin Harvoni treatment, which has a demonstrated 95% to 99% cure rate in cases such as theirs.

52.     To date, Defendant continues to deny Oakes, Burt and Class Members coverage for this breakthrough treatment, demanding that they wait until their medical conditions have worsened to the point that irreparable injury has occurred. Absent judicial intervention, significant, irreversible deterioration to Plaintiffs' and Class Members' liver function must occur before Defendant will deign to provide coverage for Harvoni treatment. Specifically, unlike those patients with F0-F2 liver scarring, those who have reached stage F3 or F4 face a much higher risk of liver cancer.[15] In fact, the AASLD recommends that patients who have reached F3- or F4-level liver scarring be

---

[15] http://www.hcvguidelines.org/full-report/monitoring-patients-who-are-starting-hepatitis-c-treatment-are-treatment-or-have.

tested for hepatocellular carcinoma (i.e. liver cancer) every 6 months for the rest of their lives.[16] In other words, instead of treating all hepatitis C patients regardless of liver deterioration, Defendant is forcing Class Members to develop such severe liver scarring that they will require a lifetime of medical monitoring, even if their hepatitis C is cured.

53. Nothing in Oakes' Policy, Burt's Policy or the materially identical Policies of Class Members, permits Defendant to deny coverage for a potentially life-saving cure until a disease has caused irreparable injury and irreversible liver damage, including severe fibrosis or cirrhosis. Moreover, no clinical criteria supports "prioritizing" treatment based on how much an Insured has suffered from an otherwise incurable disease, let alone the price of a proven miracle cure for that disease.

54. At bottom, the Oakes Policy and Burt Policy, consistent with the Policies of Class Members, promise to provide coverage for medically necessary treatment. The Policies contain a materially identical definition of medical necessity, which contain the only criteria Defendant actually disclosed to Plaintiffs and Class Members before sending them letters denying coverage for Harvoni treatment.

55. Harvoni treatment unquestionably satisfies the operative definition of medical necessity and any lawful standard of objective reasonableness. Nothing in the Policies (or the law) requires Class Members to allow their medical condition to deteriorate to the point of suffering irreparable, severe fibrosis of the liver (or worse) before their doctors' prescribed Harvoni treatment becomes "medically necessary."

56. Defendant's contractual standard of "medical necessity" is not the standard it applied in denying Oakes' and Burt's claims (and the claims of other Class

---

[16] *Id.*

Members) for Harvoni treatment. Instead Defendant applied an undisclosed and much more restrictive standard (that was inherently fraudulent), which plainly was created to increase profits by limiting Plaintiffs' and Class Members' access to this life-saving medication. Defendant continues to use its pretextual cost-avoidance "criteria" to deny the claims of Plaintiffs and Class Members, and will do so until ordered to stop.

57.     As a matter of law, Defendant was required to rely on the plain language of the Policies to determine coverage eligibility for Harvoni treatment. Defendant flagrantly breached its duties by ignoring that Policy language and denying coverage based on its inherently fraudulent, cost-avoidance scheme, which served only to elevate profit-seeking over its duties to Plaintiffs and Class Members.

58.     The Policies by which Defendant insures Plaintiffs (and similarly situated Class Members) are substantially similar in all material respects, are the complete expression of the parties' agreement, and contain materially identical definitions of "medical necessity," or definitions with immaterial differences.

59.     By relying on inherently fraudulent and pretextual, purported "medical criteria" to deny Plaintiffs' and Class Members' claims for coverage for Harvoni treatment, Defendant has breached and is breaching its Policies with Plaintiffs and Class Members.

## ERISA ALLEGATIONS

60.     ERISA requires that all employee benefit plans establish and maintain reasonable claims procedures. Specifically, 29 C.F.R. section 2560.503- 1(b)(5) requires that "[t]he claims procedures contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with

governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants." 29 C.F.R. § 2560.503-l(b)(5).

61.    Moreover, ERISA only allows claims administrators to rely on internal rules or policies in construing the terms of an employee benefits plan if those rules or policies reasonably interpret the applicable plan.

62.    By issuing coverage guidelines and making coverage determinations on behalf of ERISA-governed insurance plans, Defendant has acted, and is acting, as a plan administrator and its actions give rise to a fiduciary duty on behalf of the ERISA-governed plans that it administers. As a fiduciary, Defendant is legally required to discharge its duties "solely in the interests of the participants and beneficiaries" and for the "exclusive purpose" of providing benefits to participants and their beneficiaries and paying reasonable expenses of administering the plan.

63.    Defendant has an inherent conflict of interest in its administrative role because every claim it denies increases its profits. Even self-funded plans—where benefits are paid, in the first instance, from the assets of plan sponsors—have stop-loss provisions that obligate the insurer to pay benefits that exceed a certain threshold. Thus, as to any self-funded plan, Defendant has the same profit-boosting incentive to deny coverage that it has with regard to a fully insured plan, because every Harvoni claim Defendant denies makes it less likely that the stop-loss threshold will be crossed, which reduces its potential (or actual) liability to pay for benefits.

64.    Defendant, as a plan administrator with discretionary authority to determine whether Insureds are entitled to benefits under their insurance plans and

Policies, has systematically ignored the treatment recommendations of Plaintiffs' and Class Members' doctors, and has used internal "clinical guidelines" that are inconsistent with the plain language of Plaintiffs' and Class Members' plans and Policies to deny Harvoni coverage. Specifically, Defendant has applied and continues to apply inherently fraudulent guidelines that unlawfully deny coverage unless and until Oakes, Burt, and Class Members first suffer, then demonstrate the irreversible liver damage of F3 fibrosis or F4 cirrhosis. This practice is wholly inconsistent with the terms of Plaintiffs' and Class Members' policies, as well as ERISA. Defendant's use of inherently fraudulent guidelines is flatly inconsistent with the "broadly protective' purposes of ERISA" and would allow Defendant free reign to re-write plan terms and restrict or broaden coverage as it sees fit. Thus, Defendant has breached its fiduciary duty by supplanting the terms of the Policies with inherently deceptive and fraudulent guidelines that promote its unlawful cost-avoidance scheme designed and intended to boost profits by denying coverage for a hepatitis C miracle cure to 80% of its Insureds who need it.

## CLASS ALLEGATIONS

### A.   Class Definition

65.    Plaintiffs Oakes and Burt bring this action against Defendant under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other similarly situated persons, and seeks to represent the following Class:

> All participants or beneficiaries in an insurance plan governed by ERISA, for which BC Florida, its affiliates, subsidiaries, agents, or entities, have, or have been delegated, the authority to make coverage decisions with respect to claims for Harvoni treatment, who (1) have hepatitis C and Stage F0, F1, or F2 fibrosis, (2) have received a prescription from their treating physician for Harvoni, and (3) have been denied coverage for Harvoni treatment by Defendant or their affiliates, subsidiaries, agents, or entities because they do not have Stage F3 or F4 fibrosis.

66.     Plaintiffs reserve the right to modify or amend the definitions of the proposed class before the Court determines whether class certification is appropriate.

**B.     Rule 23(a)(1) – Numerosity**

67.     The individual Class Members are so numerous that their individual joinder is impracticable. Defendant sells many thousands of health insurance policies in the state of Florida and throughout the country and, as a general business practice, has failed to comply with applicable law. Moreover, individual Class Members easily can be identified from Defendant's business records, because Defendant knows (a) who the Insureds are, (b) which plans they are insured under, (c) what types of claims they have filed, and (d) how those claims were adjudicated.

68.     On information and belief, the number of Class Members is in the thousands. Their precise number will be determined through discovery, but they are too numerous to be consolidated in one complaint, and it is impractical for each to bring an individual action.

**C.     Rule 23(a)(2) – Commonality**

69.     There are questions of law and fact that are common to Plaintiffs' and Class Members' claims.

70.     Common questions of law and fact include, but are not limited to, the following:

(a)     Whether Defendant is categorically denying coverage for Harvoni treatment to Class Members suffering from stage F0, F1, or F2 liver fibrosis, regardless of whether or not treatment is medically necessary;

24

(b)     Whether Defendant is acting and/or refusing to act on grounds generally applicable to Plaintiffs and Class Members;

(c)     Whether Defendant's pattern and practice of denying coverage for Harvoni treatment to Plaintiffs and Class Members suffering from stage F0, F1, or F2 liver fibrosis constitutes a wrongful denial of plan benefits under ERISA;

(d)     Whether Defendant has breached its fiduciary duties under ERISA in the administration of Plaintiffs' and Class Members' claims for plan benefits;

(e)     Whether creation of inherently deceptive and fraudulent coverage guidelines in service of a cost-avoidance scheme constitutes a breach of fiduciary duty;

(f)     Whether Defendant's misrepresentations as to medical necessity and its failure to disclose a cost-avoidance scheme intended to disregard the Policies' definition of medical necessity, and other practices described above, violated Defendant's fiduciary duties to refrain from misrepresentations and make truthful disclosures to Plaintiffs Oakes, Burt and Class Members;

(g)     Whether Defendant is liable to Plaintiffs and Class Members for damages and injunctive relief from its ERISA violations;

71.     The above-identified common questions predominate over questions, if any, that might affect only individual Class Members.

72.     Defendant has subjected (and is subjecting) Plaintiffs and Class Members to the same harm in the same manner. The conduct described above constitutes Defendant's standard business practice.

**D.      Rule 23(a)(3) – Typicality**

73.     Defendant's own records demonstrate that Plaintiffs are members of the Class. Plaintiffs' claims are typical of the claims of Class Members because they are based on the same legal theories, arise from the similarity, uniformity, and common purpose of Defendant's unlawful conduct, and are not subject to any unique defenses. Members of the Class have sustained, and will continue to sustain, damages in the same manner as Plaintiffs' as a result of Defendant's wrongful conduct.

74.     Moreover, as to the Class Members, Defendant issued and administered Policies in which it made promises materially identical to those it made to Plaintiffs Oakes and Burt—to cover medically-necessary treatment—and engaged in materially identical conduct in wrongfully denying those claims. Thus, the promises, practices, and decisions that Defendant made with respect to Oakes' and Burt's claim for Harvoni coverage are materially the same as those it made with regard to the Class Members' claims for Harvoni coverage.

**E.      Rule 23(a)(4) – Adequacy of Representation**

75.     Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of its Members. Plaintiffs are committed to the vigorous prosecution of this action, and have retained competent counsel who are experienced in litigation of this nature to represent them. There are no conflicts or antagonism between the interests of Plaintiffs and unnamed Class Members.

76.     To prosecute their case, Plaintiffs have chosen the law firm of Rivero

Mestre LLP, and are obligated to pay a fee for that representation. This firm is

experienced in class action litigation and possesses the financial and legal resources to

deal with the costs and legal issues inherent in this action.

**F.      Requirements of Fed. R. Civ. P. 23(b)(3)**

77.     Questions of law or fact common to Plaintiffs' and Class Members' claims

predominate over any questions of law or fact affecting only individual Class Members.

All claims by Plaintiffs and Class Members arise from Defendant's common course of

unlawful conduct, in breach of the Policies and violation of ERISA. The predominating

questions of law and fact include those set forth above in Paragraph 70.

78.     Common issues predominate where, as here, liability can be determined

on a class-wide basis, even if there might be the need for some individualized damages

determinations. As a result, in determining whether common questions predominate,

courts focus on the liability issue, and if the liability issue is common to the class, as it is

in this case, common questions will be held to predominate over individual questions.

**G.      Superiority**

79.     A class action is superior to individual actions, in part because of the

following, non-exhaustive list of factors:

(a)     Individual joinder of all Class Members would impose extreme hardship

        and inconvenience on them, because they reside all across the nation;

(b)     Individual claims by Class Members are impractical because the cost of

        pursuing an individual claim could exceed its value. As a result, individual

Class Members have no interest in prosecuting and controlling separate actions;

(c)    There are no known Class Members who are interested in individually controlling the prosecution of separate actions;

(d)    The interests of justice will be served by resolving the common disputes of all Class Members in one forum;

(e)    Judicial and party resources will be conserved by resolving the common disputes of all Class Members in one forum;

(f)    Individual claims would not be cost effective or economically feasible to pursue through individual actions; and

(g)    The action is manageable as a class action.

**H.    Requirements of Fed. R. Civ. P. 23(b)(1)(a) & 23(b)(2)**

80.    The prosecution of separate actions by (or against) individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendant and any other party opposing the Class.

81.    Defendant has acted or failed to act in a manner generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to all Class Members.

**COUNT I**
**Claim for Improper Denial of Benefits**
**(Applicable to Plaintiffs Oakes, Burt, and Class Members)**

82.    Plaintiffs Oakes, Burt, and the Class Members re-allege paragraphs 1 through 81, as if fully set forth here.

28

83.     This count is brought under 29 U.S.C. § 1132(a)(1)(B).

84.     Plaintiffs Oakes, Burt, and Class Members are covered by insurance plans issued by Defendant. Under the terms and conditions of the insurance plans and applicable federal law, Defendant is required to cover and approve payment for treatment that is medically necessary. Such treatment indisputably includes treatment for Harvoni—a miracle cure for a hitherto incurable disease that can cause cancer and death—which is medically necessary under any standard of objective reasonableness.

85.     Defendant is the entity responsible for administering and making benefit determinations under Plaintiffs' and Class Members' health insurance plans, and for developing internal practices and policies that are applied to such determinations. Specifically, Defendant, among other things, exercises discretionary authority or control over the management of the plans, exercises authority or control over management or disposition of the plans' assets, and has the authority to make decisions (and does make decisions) regarding claims for benefits and appeals thereof, including approving payment and writing checks for coverage.

86.     Defendant wrongfully denied claims submitted by Plaintiffs Oakes, Burt and Class Members, in furtherance of an unlawful cost-avoidance scheme that employed policies and practices that are inconsistent with the relevant terms of Plaintiffs' and Class Members' health insurance plans and ERISA.

87.     Defendant's improper denials have caused damage to Plaintiffs Oakes, Burt, and Class Members in the form of uncovered and unreimbursed claims for Harvoni treatment.

88.     Pursuant to 29 U.S.C. § 1132(a)(3), Plaintiffs Oakes, Burt and Class Members have a right to injunctive relief and damages, together with attorneys' fees and costs.

<u>**COUNT II**</u>
**Claim for Other Appropriate Equitable Relief**
**(Applicable to Plaintiffs Oakes, Burt, and Class Members)**

89.     Plaintiffs Oakes, Burt, and the Class Members re-allege paragraphs 1 through 81, as if fully set forth here.

90.     This Count is brought under 29 U.S.C. § 1132(a)(3)(B), and is separate and distinct from the relief sought under Count I. Specifically, this Count seeks to redress Defendant's breaches of fiduciary duties through its across-the-board, mechanical application of pretextual, inherently fraudulent coverage guidelines to elevate profits over the needs of plan Insureds. Relief under Count I will not make Plaintiffs and the Class Members whole.

91.     As the entity responsible for making benefit determinations under Plaintiffs' and Class Members' health insurance plans, and for developing internal practices and policies applied in making such determinations, Defendant is an ERISA fiduciary within the meaning of 29 U.S.C. §§ 1109(a) and 1002(21)(A). Specifically, Defendant, among other things, exercises discretionary authority or control over the management of the plans, exercises authority or control over management or disposition of the plans' assets, and has the authority to make decisions (and does make decisions) regarding claims for benefits and appeals thereof, including approving payment and writing checks for coverage.

92.     As an ERISA fiduciary, Defendant owed Plaintiffs Oakes, Burt, and Class Members numerous fiduciary duties, including the duty to make decisions in accordance with plan terms and ERISA requirements.

93.     Notwithstanding its fiduciary obligations, Defendant developed and relied on an inherently fraudulent cost-avoidance scheme and pre-authorization "guidelines" that improperly restricted Harvoni coverage in contravention of Plaintiffs' and Class Members' health insurance plan terms and ERISA requirements. In doing so, Defendant violated its fiduciary obligations.

94.     Plaintiffs Oakes, Burt and Class Members have been harmed by Defendant's breaches of fiduciary duty, because their claims have been subjected to inherently fraudulent and unlawful restrictions that are not part of the health insurance plans at issue, which violates ERISA.

95.     Additionally, by engaging in this misconduct, Defendant has been unjustly enriched insofar as it has reaped (and kept) millions of dollars in premiums that it never honored by providing contractually-promised coverage for medically-necessary treatment.

96.     Pursuant to 29 U.S.C. § 1132(a)(3)(B), Plaintiffs Oakes, Burt, and the Class Members have a right to restitution, disgorgement, surcharge and other appropriate equitable relief, together with attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs on their own behalf and on behalf of all similarly situated Class Members (as defined above), demand judgment against Defendant as follows:

(1)    Declaring (1) that this action is a proper class action maintainable under Rule 23(a), and one or more of Rules 23(b)(1)(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, (2) that Plaintiffs shall serve as class representatives, and (3) that Rivero Mestre LLP shall serve as counsel for the Class;

(2)    Declaring that Defendant's cost-avoidance scheme and fraudulent coverage guidelines are contrary to, and violate, the terms of ERISA;

(3)    Ordering Defendant to recalculate and issue unpaid benefits to Plaintiff Oakes, Burt, and Class Members, whose claims were denied as a result of Defendant's unlawful conduct;

(4)    Awarding other appropriate equitable relief to Plaintiffs Oakes, Burt, and Class Members (under 29 U.S.C. § 1132(a)(3)), including (a) enjoining Defendant from using hidden, cost-based criteria to deny coverage of medically-necessary Harvoni treatment in furtherance of an unlawful cost-avoidance scheme, (b) restitution of premiums, (c) disgorgement of profits, and (c) a surcharge remedy.

(5)    Awarding Plaintiffs and Class Members their costs and disbursements, and reasonable allowances for fees and reimbursement of expenses, including reasonable attorney and expert fees. pursuant to 29 U.S.C. § 1132(g), in amounts to be determined by the Court; and

(6)    Awarding such other and further relief as the interests of justice require.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class request a trial by jury of any and all Counts for which a

jury trial is permitted by law.

Respectfully submitted on February 10, 2016

> RIVERO MESTRE LLP
> *Attorneys for Plaintiffs and the Class*
> 2525 Ponce de Leon Blvd., Suite 1000
> Miami, Florida 33134
> Telephone:  (305) 445-2500
> Facsimile:   (305) 445-2505
> E-mail: arivero@riveromestre.com
> E-mail: arolnick@riveromestre.com
> E–mail: jmestre@riveromestre.com
> E–mail: cwhorton@riveromestre.com
> Secondary: mferguson@riveromestre.com
>
> By:   /s/ Andrés Rivero
>       ANDRÉS RIVERO
>       Florida Bar No. 613819
>       JORGE A MESTRE
>       Florida Bar No. 088145
>       ALAN H. ROLNICK
>       Florida Bar No. 715085
>       CHARLES E. WHORTON
>       Florida Bar No. 46894

## CERTIFICATE OF SERVICE

I certify that on February 10, 2016, I electronically filed this document with the
Clerk of the Court using CM/ECF.

>       s/ Andrés Rivero
>       ANDRÉS RIVERO