**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No.: 9:16-CV-80028-ROSENBERG/BRANNON

EUGENE OAKES, KEITH BURT, and
DEBBIE HARRIS, individually and on
behalf of a class of similarly situated persons,

v.

BLUE CROSS AND BLUE SHIELD
OF FLORIDA, INC., d/b/a/ FLORIDA
BLUE,

_____/

**PLAINTIFFS' MOTION FOR FINAL APPROVAL**
**OF CLASS ACTION SETTLEMENT, APPLICATION FOR SERVICE AWARDS,**
**APPLICATION FOR ATTORNEYS' FEES AND EXPENSES, AND**
**MEMORANDUM OF LAW IN SUPPORT**

## <u>TABLE OF CONTENTS</u>

**Page**

I.    **INTRODUCTION**.................................................................................................1

II.   **FACTUAL BACKGROUND**.................................................................................3

    A.    The RICO Action and the ERISA Action.................................................3

    B.    The Settlement Terms and Agreement....................................................5

        1.    *The Settlement Class*.......................................................................6

        2.    *The Relief and Settlement Consideration* ...................................6

        3.    *Release of Claims* ..........................................................................7

        4.    *Class Counsel Fees and Expenses and Named Plaintiffs' Case-Contribution Service Awards* ......................................................7

    C.    Preliminary Approval, Notice and Settlement Administration....................7

III.  **THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL**................9

    A.    The Settlement is the Product of Good Faith, Informed, Arm's-Length Negotiations Among Experienced Counsel .......................................11

    B.    The Issues Presented Were Highly Complex, and Settlement Approval Will Save the Class Years of Extremely Costly Litigation in this Court and on Appeal ......................................................................14

    C.    The Factual Record Was Sufficiently Developed to Enable Class Counsel to Make a Reasoned Judgment Regarding the Settlement............15

    D.    Plaintiffs and the Class Would Have Faced Significant Obstacles to Obtaining Relief through Continued Litigation....................................16

    E.    The Settlement Provides the Core Relief Sought by the Actions, and its Benefits Are More than Fair, Reasonable, and Adequate When Considered Against the Possible Range of Recovery....................................17

    F.    The Opinions of Class Counsel, the Class Representatives, and Absent Class Members Strongly Favor Approval of the Settlement ......................19

IV.   **CLASS COUNSEL SHOULD BE AWARDED THEIR FEES AND COSTS, AND THE CLASS REPRESENTATIVES SHOULD RECEIVE THEIR REQUESTED SERVICE AWARDS**................................................................20

    A.    The Court Should Award the Requested Attorney's Fees and Expenses........................................................................................20

        1.    *The contingent nature of the fee, the financial burden carried by Class Counsel, and the economics of prosecuting a class action support the 1.8% award* ...............................................23

        2.    *The requested fee amount is well below the market rate in complex, contingent litigation* ...........................................23

|   | 3. | *The novelty and difficulty of the questions at issue and undesirability of the case* ........................................................... | **24** |
|   | 4. | *The skill, experience, and reputation of Class Counsel* ....................... | **25** |
|   | 5. | *The result achieved for the Class* ........................................... | **25** |
|   | 6. | *The time and labor of class counsel and preclusion of other work* ..... | **26** |
|   | 7. | *Reaction of the Class* ...................................................... | **27** |
| **B.** | | **Service Awards of $5,000 Are Appropriate** ................................... | **27** |
| **V.** | | **CONCLUSION** ................................................................ | **28** |

Plaintiffs Eugene Oakes, Keith Burt, and Debbie Harris ("Plaintiffs"), on behalf of themselves and a class of similarly situated persons, and with the consent of Defendant Blue Cross and Blue Shield of Florida, Inc. ("Florida Blue"), move for entry of an order (1) granting final approval of the class action settlement set forth in the parties' Settlement Agreement and Release (the "Settlement" or "Agreement" (D.E. 52-1)), (2) certifying a class for settlement purposes, (3) granting service awards to the class representatives, and (4) awarding class counsel their attorneys' fees and expenses. All of the relief requested by this motion should be granted, because the Settlement provides exactly what the Plaintiffs' class actions were filed to obtain, coverage for Harvoni treatment that they had been denied.

## I.     **INTRODUCTION**

On June 21, 2016, the Court preliminarily approved the Settlement (D.E. 54), which was reached by the parties after rigorous litigation and negotiation. Through that Settlement, Florida Blue will expand coverage for the breakthrough drug Harvoni—a life-saving cure for hepatitis C—to approximately 2,000 people suffering from hepatitis C, to whom Florida Blue previously had denied Harvoni coverage and treatment. This relief has an aggregate monetary value of least $126,000,000 to the Settlement Class (the "Class Members" or "Class"). The Settlement Agreement requires Florida Blue to remove from its guidelines a restriction that denied Class Members coverage for Harvoni treatment, because they were insureds who could not demonstrate severe fibrosis or cirrhosis of the liver (the "fibrosis restrictions"). By removing these restrictions, the Settlement provides for Class Members (and other Florida Blue insureds with hepatitis C) to get covered Harvoni treatment, which otherwise would cost each Class Member at least $63,000, for an aggregate value to the Class of $126,000,000.

1

By this motion, Plaintiffs seek entry of an order providing for final approval of the Settlement, final certification of the Settlement Class, the award of attorneys' fees and expenses to Class Counsel (which the Settlement requires Florida Blue to pay in addition to providing Harvoni coverage), together with service awards to the named Plaintiffs. The Court should order final approval of the Settlement, because it is fair, reasonable, adequate, and an excellent result for Class Members in a very difficult case. The undersigned are well positioned to make this recommendation after having actively litigated this case and similar cases for more than a year. During that time, Class Counsel spent thousands of hours researching and investigating claims, allegations, and defenses regarding Florida Blue's denial of Harvoni coverage, including reviewing thousands of documents and relevant medical literature, interviewing numerous experts in the field, and speaking with numerous Class Members. Our investigation gives us a thorough understanding of the strengths and weaknesses of this case, and allows us to readily evaluate the risks associated with it, as well as the fairness of the proposed Settlement, which was reached after months of intense, arm's-length negotiations, involving three formal, in-person mediations, and many more informal negotiations.

With this thorough understanding, Plaintiffs and Class Counsel submit that the Settlement is a tremendous victory for Class Members, because it provides the relief that was the *raison d'etre* for this class action, namely, the removal of life-shortening fibrosis restrictions on coverage for a breakthrough treatment and potentially life-saving cure for hepatitis C. The benefits and value of that relief to Class Members must be analyzed in light of the risks of protracted and contested litigation—including appeals and dispositive motion practice—which might have resulted in no recovery, no expanded coverage for Harvoni treatment, and no cure for

Class Members' hepatitis C. The proposed Settlement is, in short, an outstanding result that is in the best interests of Class Members and warrants final approval.

The adequacy of the Settlement, and the effectiveness of the Court-authorized notice, are reflected in the positive reaction from the Class. The deadline for Class Members to opt-out or object was August 5, 2016. We have received but a single untimely objection, and a handful of opt-out requests in response to the Settlement, which demonstrates its fairness and adequacy.

Finally, Plaintiffs and Class Counsel respectfully request that the Court award $2.24 million in attorneys' fees and expenses, an amount that was negotiated only after all Class benefits had been agreed to. The requested amount will be separately paid by Florida Blue in addition to, and without diminishing, the Settlement's benefits to the Class. This fee is an amount equivalent to approximately 1.8% of the value of the Settlement's benefits to the Class, and is unquestionably within the parameters of reasonableness established by the Eleventh Circuit.

Accordingly, Plaintiffs respectfully request that the Court grant final approval of the Settlement Agreement and approve their application for Class Counsel attorneys' fees and Class Representative service awards.

## II.   FACTUAL BACKGROUND

### A.   The RICO Action and the ERISA Action

On May 27, 2015, plaintiff Janie Kondell, on behalf of herself and all similarly-situated persons, sued Florida Blue, alleging that Florida Blue had breached its health insurance contracts by unlawfully denying coverage for Harvoni treatment. Kondell brought state-law contract claims seeking specific performance and declaratory and injunctive relief on behalf of people who (1) had non-ERISA health insurance plans, and (2) had been denied Harvoni treatment based on the fibrosis restrictions.

3

On July 8, 2015, Kondell amended her complaint to add plaintiff Jacques Skutt and assert claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. The RICO claims alleged that Florida Blue had engaged in a pattern of misleading and deceptive conduct through the use of pretextual guidelines that purported to be based on medical evidence when, in fact, they were not. We will refer to the amended Kondell complaint as the "RICO Action."

On October 20, 2015, the Parties exchanged initial disclosures, and on November 11, 2015, Kondell served a request for production of documents. Florida Blue moved to stay discovery on November 23, 2015, and Kondell opposed the motion, which the Court granted on December 21, 2015. Kondell later moved to reconsider that ruling for purposes of mediation, and Florida Blue agreed to provide certain information to facilitate the first mediation.

The Parties' first mediation occurred on March 8, 2016, with Paul C. Huck, Jr., Esq., acting as mediator. The mediation was aimed at resolving the RICO Action and a related action filed on January 7, 2016, by plaintiffs Eugene Oakes and Keith Burt (the "ERISA Action"). The ERISA Action asserted claims on behalf of people who (1) had ERISA-governed plans that were administered by Florida Blue, and (2) had been denied Harvoni treatment based on the fibrosis restrictions. The ERISA Action sought relief under §§ 1132(a)(1)(B) and (a)(3) of ERISA, and alleged that Florida Blue violated ERISA by unlawfully denying coverage for Harvoni through the use of pretextual guidelines. No settlement was reached after a full day of mediation on March 8th, and the litigation continued.

Florida Blue moved to dismiss the RICO and ERISA Actions in their entirety. While those motions were pending, on April 6, 2016, the ERISA plaintiffs moved to certify a class of people with ERISA-governed plans administered by Florida Blue who had been denied covered

Harvoni treatment because of the fibrosis restrictions. On April 22, 2016, Florida Blue moved to stay class certification briefing and discovery pending resolution of its motion to dismiss the ERISA Action.

On April 7, 2016, the Court heard oral argument on Florida Blue's motion to dismiss the RICO Action. Thereafter, and before the Court ruled, the parties participated in a second mediation on May 4, 2016. That all-day mediation session resulted in neither an agreement to settle nor an impasse. Negotiations continued and the litigation continued. While those negotiations continued, the Court entered an order on May 9, 2016, denying Florida Blue's motion to stay class certification discovery and briefing and discovery in the ERISA Action. A few hours later, the Court granted Florida Blue's motion to dismiss the RICO Action.

Following those orders, negotiations continued and the Parties agreed to attend a third mediation session on May 16, 2016. The mediation lasted all day and well into the night. At the conclusion of the mediation, and following intense, protracted, arm's-length negotiations, the Plaintiffs agreed in principle to settle the RICO and ERISA Actions, in exchange for Florida Blue's removal of the fibrosis restrictions from its Harvoni treatment guidelines.

### B.    The Settlement Terms and Agreement

The settlement negotiations were as hard fought as the litigation itself. However, as set forth below, after substantial and sustained effort by the Parties, with the assistance of an experienced mediator, the Parties were able to reach a proposed Settlement, which provides up to approximately 2,000 Class Members with an actual, immediate benefit that is worth approximately $126,000,000 in the aggregate. The Settlement also would provide this valuable benefit of expanded coverage for Harvoni treatment to non-class members, including those Florida Blue insureds who were deterred from seeking Harvoni treatment by the fibrosis

restrictions, and those who are new (or future) enrollees in a Florida Blue health insurance plan or ERISA plan administered by Florida Blue. In other words, Florida Blue's agreement to remove the fibrosis restrictions has life-changing, and potentially life-saving implications for thousands of Class Members and other insureds. This is an outstanding result.

### 1.     The Settlement Class

The Settlement provides immediate and direct relief to the Settlement Class, which includes people who (1) have either ERISA-governed or non-ERISA governed health insurance plans, and (2) were denied coverage for Harvoni treatment because of the fibrosis restrictions. The two classes that together comprise the Settlement Class are:

- The "ERISA Class" which means all persons covered under an ERISA-governed health benefit plan, health insurance policy, or health maintenance organization contract, insured or administered by Florida Blue, who were denied coverage for the prescription drug Harvoni on or before seven (7) days prior to the Notice Deadline; and

- The "Contract Class" which means all persons covered under a non-ERISA-governed health benefits plan, health insurance policy, or health maintenance organization contract, insured or administered by Florida Blue, who were denied coverage for the prescription drug Harvoni on or before seven (7) days prior to the Notice Deadline.

### 2.     The Relief and Settlement Consideration

The Settlement requires Florida Blue to remove fibrosis restrictions as a basis to deny coverage for Harvoni treatment under Florida Blue's medical coverage guidelines for hepatitis C drug therapy within 50 days from the date the Court enters the Preliminary Approval Order. In other words, as to any Class Member who was previously denied coverage (and for any insured who seeks coverage in the future), Florida Blue will not be permitted to deny coverage for Harvoni treatment based on that person's failure to demonstrate any particular level of fibrosis. Florida Blue also agrees to use reasonable efforts to process, on an expedited basis, any Class Member's resubmitted request for coverage within 5 business days.

### 3.     *Release of Claims*

In exchange for the settlement consideration, members of the Settlement Class will release Florida Blue and its respective past, present, and future officers, directors, shareholders, stockholders, policyholders, members, principals, parents, subsidiaries, affiliates, divisions, partners, insurers, reinsurers, employees, servants, agents, representatives, administrators, executors, beneficiaries, heirs, trustees, fiduciaries, attorneys, accountants, auditors, advisors, predecessors-in-interest, successors-in-interest, and assigns, from any and all past, present, or future claims, actions, demands, lawsuits, rights, liabilities, damages, losses, indebtedness, obligations, attorneys' fees, interest, expenses, costs, and causes of action, arising from or in any way related to the hepatitis C virus or any health or economic condition or circumstance caused by or in any way related to hepatitis C. The complete text of the release is attached as Appendix B to the proposed Final Approval Order and Judgment.

### 4.     *Class Counsel Fees and Expenses and Named Plaintiffs'*
### *Case-Contribution Service Awards*

Florida Blue has agreed to pay, separate and apart from the cost of providing Harvoni treatment to the Class Members, $2.24 million in attorneys' fees and expenses, which includes case-contribution service awards ("service awards") not to exceed $5,000 to each named plaintiff. The Parties also agreed that the consideration of whether to grant or deny these requested sums is to be separate and apart from the Court's consideration of the fairness, reasonableness, and adequacy of the settlement.

### C.     **Preliminary Approval, Notice and Settlement Administration**

The Court preliminary approved the terms of the Settlement Agreement and certified the proposed Settlement Class on June 21, 2016. *See* Order Granting Preliminary Approval (D.E. 54) (hereinafter the "Preliminary Approval Order"). The Court found that:

> (a) the Parties consummated the Settlement after Class Counsel had duly investigated the issues raised by Plaintiffs' claims and the Parties had conducted extensive arm's-length negotiations; (b) the Settlement provides valuable consideration; and (c) the Settlement is sufficiently fair, adequate, and reasonable to the Settlement Class and within the reasonable range of possible final approval to warrant providing notice to Settlement Class Members and holding a full hearing on the Settlement.

*See* D.E. 54 at ¶ 2. In the Preliminary Approval Order, the Court also approved the proposed Class Notice and notice plan, finding that it meets the requirements of Rule 23 of the Federal Rules of Civil Procedure, and provides the best notice practicable under the circumstances. *Id*. at ¶¶ 11-12. The Court ordered Florida Blue to begin dissemination of the Class Notice within 15 days of the entry of the Preliminary Approval Order. *Id*. at ¶ 27.

The Settlement Administrator, Kurtzman Carson Consultants ("KCC"), obtained a list of names with addresses of individuals who were identified as Settlement Class Members. *See* **Exhibit A** – Declaration of Beth Verdekal ("KCC Decl.") at ¶ 8. Prior to mailing, KCC processed the list through the National Change of Address (the "NCOA") database. *Id*. at ¶ 10. The NCOA contains all requested changes of address which have been filed with the United States Postal Service. *Id.* KCC mailed a total of 2,387 notices using First-Class mail. *Id.* at ¶ 11. As of August 9, 2016, 63 packets were returned as undeliverable. *Id*. at ¶ 12. KCC searched the 63 undeliverable addresses, and for 44 KCC found updated addresses and re-mailed the packets to those addresses. *Id.*

On July 6, 2016, KCC created a case-dedicated website for Settlement Class Members to obtain information about the Settlement. *See* KCC Decl. at ¶ 13. Specifically, the website provided Settlement Class Members with full-length Notice as well as relevant court documents, and important dates. *Id*. KCC also activated a toll-free number with live operator support, which allowed Settlement Class Members to listen to answers to frequently asked questions regarding

the Settlement, leave a request to have a notice mailed to them, and speak with a live operator. *Id.* at ¶ 9. KCC also mailed the requisite notice under the Class Action Fairness Act on June 24, 2016, and sent to the U.S. Attorney General, the Attorneys General for all 50 States and the District of Columbia, the Attorneys General for the 5 recognized voting U.S. Territories, the Chairman of the FDIC, the Insurance Commissioners for all 50 States and the District of Columbia, the Insurance Commissioners for the 5 recognized voting U.S. Territories, as well as parties of interest to this Action; the mail list consisted of 115 entities. *Id.* at ¶ 7.

Pursuant to the Settlement Agreement and Preliminary Approval Order, the deadline for Class Members to object to or opt out of the Settlement Agreement was August 5, 2016. *See* Preliminary Approval Order [D.E. 54] at ¶ 27. As of this date, KCC received one untimely objection and 14 timely opt out requests.[1] *See* KCC Decl. at ¶¶ 14-15.

## III.     THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL

Public and judicial policy both strongly favor pretrial settlement of litigation. This policy is particularly compelling in class actions and other complex litigation. *See In re United States Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Public policy strongly favors the pretrial settlement of class action lawsuits."); *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984) ("our judgment is informed by the strong judicial policy favoring settlement"); *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)[2] ("Particularly in class action suits, there is an overriding public interest in favor of settlement."); *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d

---

[1] The Settlement Agreement and Notice instructed that in order to timely object, any potential objector must file a written objection with the Clerk of Court by August 5, 2016. *See* D.E. 52-1 at II.F.1. The objection here was filed with the Clerk of Court on August 8, 2016.

[2] Opinions of the Fifth Circuit issued prior to October 1, 1981 are binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209-11 (11th Cir. 1981) (*en banc*).

9

1298, 1314 (S.D. Fla. 2005) ("there exists 'an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex'").

The cases ask courts considering class action settlements to be guided not only by the strong public policy favoring settlement, but also by "the realization that compromise is the essence of settlement." *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. 1982); *see Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 538 (S.D. Fla. 1988) ("When exercising its discretion, a court should always review the proposed settlement in light of the strong judicial policy that favors settlements.") (citations omitted).

Final approval under Fed. R. Civ. P. 23(e) is warranted when a class-action settlement is "fair, adequate and reasonable [and] . . . not the product of collusion between the parties." *Bennett*, 737 F.2d at 986-87 (internal quotation marks and citations omitted); *accord Cotton*, 559 F.2d at 1330. Courts are "not called upon to determine whether the settlement reached by the parties is the best possible deal, nor whether class members will receive as much from a settlement as they might have recovered from victory at trial." *In re Mex. Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1014 (N.D. Ill. 2000) (citations omitted). Instead, courts in this Circuit consider the following factors: (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense and duration of litigation; (3) the stage of proceedings at which the settlement was achieved and the amount of discovery completed; (4) the probability of the plaintiff's success on the merits; (5) the range of possible recovery; and (6) the opinions of class counsel, class representatives, and the substance and amount of opposition received. *Leverso v. SouthTrust Bank of Ala., N.A.*, 18 F.3d 1527, 1530 n.6 (11th Cir. 1994); *see also Bennett*, 737 F.2d at 986. "In assessing these factors, the Court 'should be hesitant to substitute . . . her own judgment for that of counsel.'" *Lipuma*, 406 F. Supp. 2d at 1315 (quoting *In re Smith,* 926 F.2d

10

1027, 1028 (11th Cir. 1991)). Application of these factors to the Settlement demonstrates that it should be approved.

A.   **The Settlement is the Product of Good Faith, Informed, Arm's-Length Negotiations Among Experienced Counsel**

The threshold consideration is whether a proposed settlement is the product of fraud or collusion between the parties. "In determining whether there was fraud or collusion, the court examines whether the settlement was achieved in good faith through arm's-length negotiations, whether it was the product of collusion between the parties and/or their attorneys, and whether there was any evidence of unethical behavior or want of skill or lack of zeal on the part of class counsel." *Canupp v. Sheldon*, 2009 WL 4042928, at *9 (M.D. Fla. 2009) (citing *Bennett*, 737 F.2d at 987, n.9). Courts "presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered." 4 NEWBERG ON CLASS ACTIONS § 11:51 (4th ed. 2010); *accord Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992) ("Absent evidence of fraud or collusion, such settlements are not to be trifled with."); *See Hemphill v. San Diego Ass'n of Realtors, Inc.*, 225 F.R.D. 616, 621 (S.D. Cal. 2004) ("the courts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement").

Here, no claim of fraud or collusion in the negotiation of the Settlement could be credibly asserted. The record demonstrates extensive, arm's-length negotiations—including three formal, in-person mediation sessions, as well as numerous conferences among counsel and mediator Paul C. Huck, Jr., who has significant experience in successfully mediating complex actions. *See* **Exhibit B** – Declaration of Andres Rivero (the "Rivero Decl.") at ¶¶ 8-11. Mr. Huck's involvement also weighs in favor of preliminary approval. *Nelson v. Mead Johnson & Johnson Co.*, 484 Fed. Appx. 429, 435 (11th Cir. 2012) (finding no collusion where "the settlement

11

agreement was the result of extensive arm's-length negotiations moderated by the court-appointed mediator"); *In re WorldCom, Inc. ERISA Litig.*, 2004 WL 2338151, at *6 (S.D.N.Y. 2004) (finding settlement reasonable where "[a] respected and dedicated judicial officer presided over the lengthy discussions from which this settlement emerged"); *See Holman v. Student Loan Xpress, Inc.*, 2009 WL 4015573, at *5 (M.D. Fla. 2009) (finding "no apparent fraud or collusion" where a "settlement [was] the product of . . . arm's-length, 'protracted and contentious' negotiation with a mediator"); *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1384 (S.D. Fla. 2007) (parties' use of an "experienced and well-respected mediator" supported court's finding that settlement was fair and not the product of collusion); *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) (same).

    The Parties' extensive negotiations also were facilitated by the sharing of information through an informal discovery process. *See* Rivero Decl. at ¶¶ 6, 7, 16. From that information, as well as Class Counsel's extensive investigation, the parties provided the mediator with comprehensive mediation statements addressing the strengths and weaknesses of the claims and defenses asserted in the Actions. *Id*. Over the course of two months (from March to May 2016), the Parties and the mediator spent long hours explaining their positions and views on all issues. *Id*. at ¶¶ 7-11, 16. Evidence gathering to facilitate mediation and settlement need not require formal discovery, and the use of informal methods to obtain evidence herein greatly assisted counsel in assessing the strengths and weaknesses of their respective positions. *See, e.g., D'Amato v. Deutsche Bank*, 236 F.3d 78, 87 (2d Cir. 2001) ("although no formal discovery had taken place, the parties had engaged in an extensive exchange of documents and other information . . . thus, the stage of the proceedings' factor . . . weighed in favor of settlement approval") (internal citation omitted); *Corrugated Container Antitrust Litig.*, 643 F.2d at 211

("The trial court may legitimately presume that counsel's judgment that they had achieved the desired quantum of information necessary to achieve a settlement is reliable.") (internal quotations and citations omitted); *Cotton*, 559 F.2d at 1332 ("Discovery in its most efficient utilization should be totally extra-judicial [and . . .] informality in the discovery of information is desired.").[3]

Finally, litigation of the Actions was vigorously adversarial. In the fourteen months during which the claims were pending, the Parties engaged in significant motion practice, including motions to dismiss (*see Kondell*, D.E. 27, 40, 46, 47, 49; *Oakes*, D.E. 24, 31, 32, 34, 35), motions to stay discovery (*Kondell*, D.E. 54, 58, 59; *Oakes*, D.E. 36, 41, 42), to lift such stays (*Kondell*, D.E. 71, 73, 74), for reconsideration (*id.*), and for class certification (*Oakes*, D.E. 33). The parties' motion practice was continuous and ongoing during the months of mediation and negotiation. *See* Rivero Decl. at ¶¶ 15-16. The vigorous nature of the proceedings confirms the absence of fraud or collusion. *See, e.g., Ingram*, 200 F.R.D. at 693 (there was "no doubt that th[e] case ha[d been] adversarial, featuring a high level of contention between the parties").

---

[3] "There is no precise yardstick to measure the amount of litigation that the parties should conduct before settling." *In re Rio Hair Naturalizer Prods. Liab. Litig.*, 1996 WL 780512, at *13 (E.D. Mich. 1996); *see also In re Austrian & German Holocaust Litig.*, 80 F. Supp. 2d 164, 176 (S.D.N.Y. 2000) ("[t]he Court need not find that the parties have engaged in extensive discovery"). The question instead is whether the parties have engaged in sufficient discovery and investigation to afford them an "adequate appreciation of the merits of the case," *In re Prudential Ins. Co. of Am. Sales Litig.*, 148 F.3d 283, 319 (3d Cir. 1998), such that the settlement is not "the product of uneducated guesswork," *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981). The test is one of sufficiency—not sheer quantity—because "it would be inconsistent with the salutary purposes of settlement," *Handschu v. Special Servs. Div.*, 787 F.2d 828, 834 (2d Cir. 1986), to find that extensive pretrial discovery is a prerequisite to approval, *Plummer v. Chemical Bank*, 668 F.2d 654, 660 (2d Cir. 1982). *See also, e.g., Cotton*, 559 F.2d at, 1332 (lack of formal discovery did not compel conclusion that insufficient discovery was conducted).

13

**B.      The Issues Presented Were Highly Complex, and Settlement Approval Will Save the Class Years of Extremely Costly Litigation in this Court and on Appeal**

This case involves highly complex legal claims and defenses brought on behalf of thousands of people who have a debilitating, life-threatening disease. The underlying factors of the case required investigating and understanding complicated factual differences in health insurance policies, the numerous laws and regulations that govern them, the fibrosis restrictions, and the bases and reasons for Florida Blue's denials of Harvoni coverage, which necessitated the consultation of experts in the field and an understanding of complex medical conditions, treatments, and terminology. *See* Rivero Decl. at ¶¶ 14, 15, 18, 19. The Actions involved complex state and federal law claims. *Id.* Florida Blue did not fail to respond with equally complex and challenging defenses and arguments. *Id.* Among many other theories, Florida Blue argued that Plaintiffs' RICO claims were preempted by the McCarran-Ferguson Act, 15 U.S.C § 1012(b) (*see Kondell*, D.E. 27 at p. 12-14), and that the contract and ERISA claims were precluded by the terms of the policies (*see Kondell*, D.E. 27 at p. 8-11; *Oakes*, D.E. 24 at p. 6-9).

While Plaintiffs continue to believe these defenses could be overcome, they are indicative of the risks and hurdles that Plaintiffs and the Class face should this matter proceed in litigation. *See* Rivero Decl. at ¶¶ 18-19. Litigating these claims undoubtedly would have proven difficult and consumed significant time, money, and judicial resources. *Id.* Even if Plaintiffs ultimately might have prevailed, that would have required significant additional trial and appellate litigation, which would have consumed large amounts of judicial and party resources. Even more importantly, protracted litigation would have consigned Class Members to an indeterminate period of time spent suffering from a debilitating, life-threatening disease, while the Parties continued to litigate over getting them the treatment the Actions were filed to get. *Id.*

14

The Settlement, on the other hand, provides the treatment the Actions were filed to get,

The Settlement, on the other hand, provides the treatment the Actions were filed to get, and does so now. This is considerable, immediate, and valuable relief for Class Members that allows them to avoid the litigation risks of unfavorable or dispositively negative rulings, as well as the supervening health risks of continued suffering from hepatitis C that will instead be treated with Harvoni pursuant to the Settlement. *See* Rivero Decl. at ¶¶ 20-22. In this Settlement, prompt treatment of a life-threatening disease is an overarching benefit beyond quantification. In short, the immediate relief provided by the Settlement plainly outweighs the risk and expense of continuing litigation, which alone demonstrates the reasonableness of the Settlement, and weighs heavily in favor of approval. *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex., on April 20, 2010*, 910 F. Supp. 2d 891, 932 (E.D. La. 2012), *aff'd*, 2014 WL 103836 (5th Cir. 2014) ("Even assuming litigation could obtain the results that this Settlement provides, years of litigation would stand between the class and any such recovery. Hence, this second . . . factor weighs strongly in favor of granting final approval to the Settlement Agreement."); *Ass'n For Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 469 (S.D. Fla. 2002) (fact that "absent settlement, this matter clearly will require a protracted and expensive trial and appeal, under circumstances where the ultimate results are highly uncertain" was a factor supporting settlement); *Perez*, 501 F. Supp. 2d at 1381 (approving settlement because "[w]ith the uncertainties inherent in pursuing trial and appeal of this case, combined with the delays and complexities presented by the nature of the case, the benefits of a settlement are clear").

### C.   The Factual Record Was Sufficiently Developed to Enable Class Counsel to Make a Reasoned Judgment Regarding the Settlement

For this factor, courts look to whether the parties have sufficient information to make an informed decision with respect to a class-wide settlement. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000). At the same time, "[t]he law is clear that early settlements are

to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations." *Ressler v. Jacobso*n, 822 F. Supp. 1551, 1555 (M.D. Fla. 1992); *see supra note* 3.

The Settlement here is informed by Class Counsel's extensive investigation and informal discovery regarding the legal and factual issues in this case. *See* Rivero Decl. at ¶¶ 7, 12, 15, 16. Before and after filing suit, Class Counsel conducted a painstaking and thorough factual and legal investigation, which included reviewing thousands of pages of medical literature and consulting with experts regarding hepatitis C, old and new types of treatment, the fibrosis restrictions on Harvoni coverage, and the complicated legal landscape for litigating treatment claims, particularly in a class action. *Id*. All of these efforts continued during the litigation, including consultations with dozens of medical experts, and extensive, continuing legal research into the claims and defenses asserted in the Actions. *Id*. Class Counsel also had numerous, ongoing discussions with the mediator regarding the Actions' factual and legal theories, and Florida Blue's defenses. *Id*. Only after this extensive effort was the Settlement reached, which was the product of a vigorous give and take by the settling parties. *Id*. Accordingly, Plaintiffs and Class Counsel had sufficient information to make an informed decision about the merits of the Settlement and determine that it represented a favorable and fair result for the Class. *Id*.

**D.**    **Plaintiffs and the Class Would Have Faced Significant Obstacles to Obtaining Relief through Continued Litigation**

"[T]he likelihood and extent of any recovery from the defendants absent . . . settlement" must be considered in assessing the reasonableness of a settlement. *See In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 314 (N.D. Ga. 1993); *see also Ressler*, 822 F. Supp. at 1555 ("[A] court is to consider the likelihood of the plaintiffs' success on the merits of his claims against the amount and form of relief offered in the settlement before judging the fairness of the

compromise."). Class Counsel and Plaintiffs believe they have a compelling case, but recognize

that Defendant has raised significant defenses to all claims. *See* Rivero Decl. at ¶ 18. As noted

above, Plaintiffs and the Class Members faced significant hurdles in the RICO Action, including

the difficult task of seeking reversal of the dismissal order through an expedited appeal. *Id*. at ¶

19. Uncertainty abounded for all Parties in the ERISA Action, where Plaintiffs and the Class

faced a motion to dismiss and Florida Blue faced a battle over class certification. *Id*. "In the face

of these headwinds then, the settlement is a favorable one." *Saccoccio*, 297 F.R.D. at 693

(approving settlement, because "the strength of the settlement in light of the many potential

pitfalls present in the case weighs in favor of accepting the settlement").

> ### E. The Settlement Provides the Core Relief Sought by the Actions, and its Benefits Are More than Fair, Reasonable, and Adequate When Considered Against the Possible Range of Recovery

Florida Blue's denial of Harvoni coverage to Plaintiffs and Class Members through the

use of the fibrosis restrictions is what caused Plaintiffs to file the Actions. The core relief sought

by the Actions was the lifting of the fibrosis restriction, and the Settlement provides for that

relief within 50 days of preliminary approval. *See* D.E. 52-1 at III.D.1. Thus, the Settlement

paves the way for up to approximately 2,000 Class Members to promptly benefit from expanded

coverage for Harvoni treatment (together with new enrollees and insureds who were deterred

from seeking coverage by the fibrosis restrictions). The monetary value of this relief to Class

Members alone is conservatively valued at $126,000,000. *See* Rivero Decl. at ¶ 22.

In sum, the Settlement provides the Class with the precise relief the litigation was filed to

obtain, which far surpasses all standards of reasonableness established by this and other courts.

*Cf. Behrens*, 118 F.R.D. at 542 (S.D. Fla. 1988) *aff'd*, 899 F.2d 21 (11th Cir. 1990) ("[T]he fact

that a proposed settlement amounts to only a fraction of the potential recovery does not mean the

settlement is unfair and inadequate . . . . A settlement can be satisfying even if it amounts to a

17

hundredth or even a thousandth of a single percent of the potential recovery."); *Bennett*, 737 F.2d at 986-87 and n.9 (approving as fair and adequate a settlement that provided 5.6% of potential recovery, in light of the risks of further litigation and the litigation's objectives); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1346 ("[N]ine percent or higher constitutes a fair settlement even absent the risks associated with prosecuting these claims."); *Sunbeam Sec. Litig.*, 176 F. Supp. 2d at 1331-32 (recovery of 10.7% of "plaintiffs' 'best case' scenario" fell "within the range of what is fair, adequate, and reasonable"); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 715 (E.D. Pa. 2001) (noting that since 1995, class action settlements have typically "recovered between 5.5% and 6.2% of the class members' estimated losses").

Moreover, courts often consider a settlement that offers only a paltry recovery to be fair, reasonable and adequate when a defendant has "strong defenses to the claims." In this case, the Defendant had strong defenses, which makes the Settlement's recovery of exactly what the Actions sought to obtain through the extraordinary relief of an injunction an even more obviously outstanding result. *See* Rivero Decl. at ¶¶ 18-19. When, in the face of strong defenses, a "settlement assures immediate payment of substantial amounts to class members," it should be approved as fair, reasonable, and adequate, "even if it means sacrificing speculative payment of a hypothetically larger amount years down the road . . . ." *Johnson v. Brennan*, 2011 WL 4357376, at *12 (S.D.N.Y. 2011). Here, Plaintiffs and the Class Members plainly faced significant obstacles to successful litigation of their claims, but the Settlement provides them with the precise relief that caused them to file the Actions in the first place. *See* Rivero Decl. at ¶¶ 18, 19, 21. This is a result that undoubtedly falls within the range of reasonableness.

**F.      The Opinions of Class Counsel, the Class Representatives, and Absent Class Members Strongly Favor Approval of the Settlement**

A court should give "great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation." *Warren v. Tampa*, 693 F. Supp. 1051, 1060 (M.D. Fla. 1988). The Court already held that Plaintiffs and Class Counsel appear capable of adequately representing the Class. *See* D.E. 54 at ¶ 4 ("Plaintiffs appear to be capable of fairly and adequately protecting the interests of Settlement Class Members in connection with the Settlement."). That conclusion was warranted.

Class Counsel have been investigating and actively litigating the denial of Harvoni treatment in this case and others for more than a year. *See* Rivero Decl. at ¶¶ 15, 16, 20, 21, 26. During that time, Class Counsel spent thousands of hours researching and investigating claims, allegations and defenses regarding Florida Blue's denial of Harvoni coverage, including reviewing thousands of pages of documents and relevant medical literature, and speaking with numerous Class Members and experts in the field. *Id*. Our investigation gives us a thorough understanding of the strengths and weaknesses of this case, and allows us to readily evaluate the risks associated with it, as well as the fairness of the proposed Settlement. *Id*. It is Class Counsel's opinion that the Settlement is fair, reasonable and adequate, and should receive the Court's final approval. *Id*.

Moreover, the overwhelming Class Member support for the Settlement is further evidence of its fairness, reasonableness and adequacy. *See, e.g.,* KCC Decl. at ¶¶ 14-15; *see also* **Exhibit 1** to Rivero Decl. There were no objections to the Court's preliminary approval of the Settlement, and, as of this date, there is but a single untimely objection to final approval, and only 14 opt-outs. *Id*.[4] This "low percentage of objections demonstrates the reasonableness of

---

[4] Class Counsel will deal with the sole objection in our reply.

[the] settlement," and supports its approval as fair and reasonable. *Perez*, 501 F. Supp. 2d at 1381; *accord Saccoccio*, 297 F.R.D. at 694 ("low resistance" to settlement consisting of eight objections and 122 opt-outs supported approval).

Whether considered independently or together, a review of the above factors confirms that the Settlement is fair, reasonable, and adequate. As such, it should be finally approved.

## IV.   CLASS COUNSEL SHOULD BE AWARDED THEIR FEES AND COSTS, AND THE CLASS REPRESENTATIVES SHOULD RECEIVE THEIR REQUESTED SERVICE AWARDS

Class Counsel immersed ourselves in this dispute as soon as we learned of it from aggrieved Class Members. For the extensive and relentless work we undertook in fighting for, and obtaining, the lifting of the fibrosis restrictions, Class Counsel seek $2.24 million in attorneys' fees and expenses. This amount is a miniscule percentage (approximately 1.8%) of the monetary value of the Settlement's benefits to the Class, and is eminently reasonable by any other measure. A service award of $5,000, which will be paid from the aggregate amount of $2.24 million, to each Class Representative also is appropriate and should be awarded.

### A.   The Court Should Award the Requested Attorney's Fees and Expenses

Both the United States Supreme Court and the Eleventh Circuit have expressly approved of calculating attorney's fees by applying the percentage-of-recovery method to the total monetary value of the settlement. *E.g., Montoya v. PNC Bank, N.A.*, 2016 WL 1529902, at *16 (S.D. Fla. 2016) (citing *Boeing v. Van Gemert*, 444 U.S. 472, 478 (1980), and *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1295-96 (11th Cir. 1999)); *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768 (11th Cir. 1991). The Eleventh Circuit recently confirmed that class counsel's fee award also should be based on the value of "any non-monetary benefits conferred upon the class by the settlement," such as injunctive relief, as well as "the economics involved in

20

prosecuting a class action." *Poertner v. Gillette Co.*, 618 Fed.Appx. 624, 628 (11th Cir. 2015); *see David v. Am. Suzuki Motor Corp.*, 2010 WL 1628362 (S.D. Fla. 2010) (settlement with ascertainable benefits may be treated as a common fund to which a percentage fee may be awarded, even if the fee is separately paid by the defendant). Thus, class counsel fees in a common-benefit settlement "shall be based on a reasonable percentage of the total benefit" of the settlement provides to the class. *Poertner*, 618 Fed.Appx. at 628 (citing *Camden I*, 946 F.2d at 774).

Using the common fund/common benefit approach, the benchmark for a reasonable class counsel fee is 25%. *Camden I*, 946 F.2d at 774. This benchmark may be adjusted up or down (generally from 20% to 30%) based on the individual circumstances of each case, using the factors set forth in *Johnson v. Ga. Highway Express, Inc.*, 448 F.2d 714 (5th Cir. 1974). *See Camden I*, 946 F.2d 774-75; *Waters*, 190 F.3d at 1294 (applying *Camden I* and affirming fee award of 33 1/3% of $50 million settlement, where District Court had used a 30% benchmark and adjusted it upwards). In this case, the value of the benefit that Class Counsel obtained for the Class is easily quantified, by multiplying the cost of Harvoni treatment ($63,000 per patient for the shortest course of treatment) times 2,000 (the number of Class Members). *See* Rivero Decl. at ¶ 22. That number amounts to at least $126 million worth of actual benefits to the Class. *Id*. The requested attorney's fee of $2.24 million is less than 1.8% of the value of the Settlement's common benefit to the Class. *Id*. at ¶ 27. This is a very modest fee under Eleventh Circuit precedent. *Camden I*, 946 F.2d at 774-875; *see also Poertner*, 618 Fed.Appx. at 628.[5]

---

[5] Courts of this Circuit have not only rejected the lodestar method (hours times rate) for calculating class counsel fees, but even as a so-called "cross-check" on the reasonableness of a percentage fee. *Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1362 (citing, *inter alia*, Alba Conte, ATTORNEY FEE AWARDS § 2.7, at 91 n. 41 ("the lodestar approach should not be imposed through the back door via a 'cross-check.'")). In rejecting the lodestar approach

The fee here is not only modest when compared to the benchmark of 20-30%, but is amply supported by application of the *Johnson* factors. Those factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the requisite skill to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *See Camden I*, 946 F.2d at 772 n.3. The Court also may consider the time required to reach settlement, the existence of substantial objections from class members, the existence of non-monetary benefits of the settlement, and the economics involved in prosecuting a class action. *Id.* at 775.

---

altogether in common fund cases, the *Camden I* court decried its inefficiencies, 946 F.2d at 773-75, while other courts have criticized its "incentive to keep litigation going in order to maximize the number of hours included in the court's lodestar calculation." *In re Quantum Health Resources, Inc.*, 962 F. Supp. 1254, 1256 (C.D. Cal. 1997). "Under *Camden I*, courts in this Circuit regularly award fees based on a percentage of the recovery, without discussing lodestar at all." *Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1363 (citation omitted). In any event, even if the Court were to perform a lodestar cross-check, the requested attorney's fee would remain eminently reasonable, because it would amount to a 2.00 multiplier. (*see* Rivero Decl. at ¶ 27). This is a modest multiplier. The range is typically 2.26 to 4, with many cases awarding much higher multipliers. *Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334 (S.D. Fla. 2007) (noting lodestar multiples "in large and complicated class actions" range from 2.26 to 4.5, while "three appears to be average" and "most lodestar multiples awarded in cases like this are between 3 and 4"). And that conclusion would be supported by the numbers alone, before considering the difficulty or undesirability of the Actions, let alone the result achieved.

22

        **1.**      ***The contingent nature of the fee, the financial burden carried by Class Counsel, and the economics of prosecuting a class action support the 1.8% award***

A determination of a fair fee for Class Counsel must include consideration of the contingent nature of the fee, the outlay of out-of-pocket expenses by Class Counsel, and the fact that the risks of failure and nonpayment in a class action are extremely high. *E.g., Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334, 1339 (S.D. Fla. 2007). These factors weigh in favor of awarding Class Counsel the requested fee, which amounts to a mere 1.8% of the value of the benefit obtained by the Settlement. Class Counsel have received no compensation during the course of this litigation and have incurred over $1,116,139.70 in unpaid fees and costs (using the lodestar method, even though courts should not impose a lodestar analysis through "the back door" as a "cross-check," *see supra* note 5). Those unpaid fees and costs were fully at risk and would have remained unpaid if Florida Blue had prevailed. *See* Rivero Decl. at ¶¶ 26-27. From the moment Plaintiffs and Class Counsel began their investigation, there was a significant likelihood of no recovery and no compensation.

        **2.**      ***The requested fee amount is well below the market rate in complex, contingent litigation***

A fee amounting to 1.8% of the value of benefits obtained for the Class is well below the market rate for class actions. "The percentage method of awarding fees in class actions is consistent with, and is intended to mirror, practice in the private marketplace where attorneys typically negotiate percentage fee arrangements with their clients." *Pinto*, 513 F. Supp. 2d at 1340. In individual cases, attorneys typically contract with clients for contingent fees between 30 and 40 percent. These percentages are the prevailing market rates throughout the United States for contingent representation. *See Pinto*, 513 F. Supp. 2d at 1341 (citing, *inter alia*, *Kirchoff v. Flynn*, 786 F.2d 320, 323 (7th Cir. 1986)). In making a determination of what constitutes a fair

percentage fee, this Court should be guided by those market rates and this Circuit's benchmark

standard. A separately paid attorneys' fee that amounts to less than 1.8% of the value of the

benefit obtained for the Class is fully consistent with, and falls far below, this Circuit's

benchmark for fees in common fund class actions, in which courts often award higher

percentages.[6]

### 3. The novelty and difficulty of the questions at issue and undesirability of the case

The record makes clear that this case presents novel and complex questions of law and

fact under RICO, ERISA, insurance regulation and the common law, as was demonstrated by the

Court's dismissal of the RICO Action. *See* Rivero Decl. at ¶¶ 18-19. The Actions required

Plaintiffs to demonstrate that Florida Blue was denying coverage through internal guidelines that

had no medical basis, and that this was a violation of ERISA and RICO, and a breach of contract,

that would support injunctive relief and specific performance to invalidate the fibrosis

restrictions. To prove this, Plaintiffs would have had to conduct significant discovery and retain

experts, which would have been expensive and risky. The magnitude of that risk is demonstrated

by the fact that no other lawyers were willing to get close to this dispute. To our knowledge,

nobody else filed a class action against Florida Blue for claims under RICO and ERISA. *Id.* at ¶

13. In short, the undesirability of this case was close to unique. *Id.* The fact that Class Counsel

reached an outstanding settlement that provides the core relief sought by the Actions, after alone

shouldering a burden that other lawyers shunned, amply supports award of the requested fee.

---

[6] *See, e.g., Gutter v. E.I. Dupont De Nemours & Co.,* 95–2152–Civ–Gold (S.D. Fla. May 30, 2003) (33-1/3 %); *Waters,* 190 F.3d 1291 (affirming 33-1/3%); *Tapken v. Brown,* Case No. 90-0691-CIV, 1992 WL 178984, Fed. Sec. L. Rep. P 96805 (S.D. Fla. 1995) (33%); *In re Home Shopping Network Sec. Litig.,* Case No. 87-428-T-13(A) (M.D. Fla. 1991) (33%).

24

### 4.    *The skill, experience, and reputation of Class Counsel*

This litigation required a high degree of skill and experience given the complexity of the issues. Class Counsel employed and deployed their significant experience gained from litigating numerous class actions in state and federal court. Beyond that, Class Counsel's reputation, diligence, expertise, and skill are reflected in the results achieved. They resolved this dispute and obtained $126 million worth of coverage in the face of an order dismissing the case with prejudice. Moreover, the quality of Class Counsel and their achievement in this case is equally shown by the strength of their opponents, McDermott Will & Emery LLP, one of the finest defense firms in the country. *See* Rivero Decl. at ¶ 17. This factor supports awarding the requested fee.

### 5.    *The result achieved for the Class*

At the end of the day, the result achieved for the class is the most important factor in assessing the reasonableness of a requested fee award. *E.g., Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ("critical factor is the degree of success obtained"); *Pinto*, 513 F. Supp. 2d at 1342; *Behrens*, 118 F.R.D. at 547-48 ("The quality of work performed in a case that settles before trial is best measured by the benefit obtained."). The result achieved here is exemplary, because the Settlement provides precisely what the Actions were filed to obtain, coverage for Harvoni treatment through invalidation of the fibrosis restrictions.

In considering the result achieved, courts consider the value of *both* monetary and injunctive relief. *See Poertner,* 618 Fed.Appx. at 628; *Perez*, 501 F. Supp. 2d 1360; *Lipuma,* 406 F. Supp. 2d at 1323; *In re Managed Care Litig.*, 2003 WL 228500700, at *6 (S.D. Fla. 2003). Here, the Settlement delivers at least $126 million worth of insurance coverage to a Class of 2,000 insureds. *See* Rivero Decl. at ¶ 22. This is a conservative estimate that does not take

account of the cost of a longer course of Harvoni treatment that some Class Members may require. Nor does it account for the fact that this relief has far-reaching consequences to those who (1) were deterred from seeking coverage by the fibrosis restrictions, or (2) recently became insured by Florida Blue, or (3) will become insured by Florida Blue. *Id*. In view of the overarching fact that obtaining this relief is what caused Plaintiffs to file suit in the first place, the Settlement is an outstanding result that supports Class Counsel's fee request. *Id*. at ¶ 21.

### 6.    *The time and labor of class counsel and preclusion of other work*

Prosecuting and settling the Actions demanded considerable time and labor, which began with interviewing insureds who had contacted us and investigating their potential claims. *See* Rivero Decl. at ¶ 6, 15. From preparing initial pleadings, to and through extensive motion practice, Class Counsel devoted many hours to legal and factual research, formal and informal discovery, as well as drafting and responding to tactical and strategic motions, including a number of dispositive motions. *Id*. Moreover, throughout the litigation, Class Counsel spent many hours working and consulting with experts in the field. *Id*. In sum, achieving this Settlement demanded considerable time and labor. To date, Class Counsel has spent 2,654.75 hours on this matter, and further time will be required in order to conclude it. *Id*. at ¶¶ 27-28.

The considerable time and energy required by this matter necessarily limited the time available for other matters. There are only so many hours in a day. Moreover, Class Counsel is a small litigation firm, so the time devoted to prosecuting this case precluded us from taking on other, hourly work that would not have presented a significant risk of nonpayment. *Montoya*, 2016 WL 1529902, at *17 (finding as a factor in support of fee that "the law firms prosecuting the case are of small size . . . and thus the time devoted to the class action precludes other employment.").

26

### 7. *Reaction of the Class*

As of this date, the claims administrator has received only 14 timely opt-out requests, and we have received but one untimely objection to the Settlement. *See* KCC Decl. at ¶¶ 14-15. The Class Notice was sent to 2,387 former and current Florida Blue insureds. *See* Id. at ¶ 11. The fact that only .59% of the Class Members opted out and only one submitted an untimely objection supports the fee request. *See Pinto*, 513 F. Supp. 2d at 1343.

### B.     Service Awards of $5,000 Are Appropriate

The Court should approve a service award of $5,000 (to be paid from the aggregate amount of $2.24 million) for each representative Plaintiff, as is customary and well-supported by precedent in the Eleventh Circuit. *See, e.g., Pinto*, 513 F. Supp. 2d at 1344. In instituting and prosecuting the Actions, each of the representative Plaintiffs acted as a private attorney general in seeking a remedy for a public wrong. *See id*. (Private class actions are a primary weapon in the enforcement of laws that protect the public.). Moreover, in pursuing the Actions, Plaintiffs courageously made public the private fact that they suffered from a debilitating, life-threatening disease. *See* Rivero Decl. at ¶ 29. Further, despite suffering from that debilitating disease, the Plaintiffs freely gave of their time consulting with and providing essential documents to Class Counsel, as well as participating in mediation sessions by phone and in person. Finally, the Class Notice advised Class Members that Plaintiffs would apply for a service award of $5,000 each, and no Class Member has objected to that reasonable request. Approval of the requested service awards is warranted.

## V.    <u>CONCLUSION</u>

For these reasons, Plaintiffs respectfully request that the Court grant final approval of the

Class Action Settlement, award Class Counsel their fees and expenses, and award each of the

Class Representative Plaintiffs the requested service award.

Respectfully submitted on August 10, 2016.

> RIVERO MESTRE LLP
> *Class Counsel*
> 2525 Ponce de Leon Blvd., Suite 1000
> Miami, Florida 33134
> Telephone:  (305) 445-2500
> Facsimile:  (305) 445-2505
> E-mail: arivero@riveromestre.com
> E-mail: arolnick@riveromestre.com
> E-mail: cwhorton@riveromestre.com

By:    /s/ Andrés Rivero
> ANDRÉS RIVERO
> Florida Bar No. 613819
> ALAN H. ROLNICK
> Florida Bar No. 715085
> JORGE A. MESTRE
> Florida Bar No. 088145
> CHARLES E. WHORTON
> Florida Bar No. 46894

### <u>CERTIFICATE OF SERVICE</u>

I certify that on August 10, 2016, I electronically served all counsel of record via e-mail.

> s/ Andrés Rivero
> ANDRÉS RIVERO

28